IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 22, 2009 Session

**STATE OF TENNESSEE v. TALLIE RILEY**

**Appeal from the Criminal Court for Knox County**
**No. 86896     Richard R. Baumgartner, Judge**

---

**No. E2008-02714-CCA-R3-CD - Filed January 11, 2010**

---

A Knox County Criminal Court jury convicted the defendant, Tallie Riley, of aggravated kidnapping, kidnapping, and aggravated criminal trespass. On appeal, the defendant avers that the trial court erred in permitting the assistant district attorney general to question the defendant about inadmissible prior bad acts, *see* Tenn. R. Evid. 404(b), and in denying his motion for mistrial. Further, the defendant alleges prosecutorial misconduct. After a careful review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Spence R. Bruner, Knoxville, Tennessee (on appeal); and Charles W. Pope, Athens, Tennessee (at trial) for the appellant, Tallie Riley.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The victim, Chandra Riley, is the ex-wife of the defendant, and this case involves an incident on March 27, 2007, that culminated in the defendant's kidnapping the victim. On May 22, 2007, a Knox County grand jury indicted the defendant for one count of especially aggravated kidnapping for using a deadly weapon to restrain the victim ("Count 1"), *see* T.C.A. § 39-13-305(a)(1) (2006); one count of aggravated kidnapping where the victim suffered bodily injury ("Count 2"), *see id.* § 39-13-304(a)(4); one count of aggravated kidnapping to facilitate the commission of a felony ("Count 3"), *see id.* § 39-13-304(a)(1);

one count of rape ("Count 4"), *see id.* § 39-13-503; and one count of aggravated burglary ("Count 5"), *see id.* § 39-14-403.

After a two-day trial, the jury found the defendant guilty of the lesser-included offense of kidnapping in Count 1, *see* T.C.A. § 39-13-303, convicted the defendant as charged in Count 2, found the defendant guilty of the lesser-included offense of kidnapping in Count 3, acquitted the defendant in Count 4, and found the defendant guilty of the lesser-included offense of aggravated criminal trespass in Count 5, *see* T.C.A. § 39-14-406. The trial court merged the kidnapping convictions for Counts 1 and 3 into the aggravated kidnapping conviction, Count 2.

After a sentencing hearing, the trial court sentenced the defendant to nine years' incarceration with the Tennessee Department of Correction as a violent offender at 100 percent of service for his Class B felony conviction of aggravated kidnapping. The court ordered a concurrent 11-month, 29-day sentence for the defendant's Class A misdemeanor aggravated criminal trespass conviction. The defendant filed a timely motion for new trial, and upon the trial court's denial of the motion, he filed a timely notice of appeal.

At trial the victim testified that she had known the defendant since 2000 or 2001 and that she had been married to him. When the couple were married, they lived in Evansville, Indiana. She explained that she had three children from a previous marriage and that her children had a close relationship with the defendant.

The victim stated that she and the defendant were divorced on October 11, 2006, and that she moved to Knoxville in February 2007. She stated that the defendant helped her move to Tennessee and that, although she had reservations about the defendant's knowing where she lived, she thought his helping her move would benefit her children. The victim further explained that she had used electronic mail to communicate with the defendant starting March 1, 2007, but she maintained that the communication was for the purpose of exchanging financial information for her pending bankruptcy filing and the divorce. The victim testified that the defendant insisted on keeping contact with the children; however, she stated that she had no desire to resume her romantic relationship with the defendant.

In March of 2007, the defendant contacted the victim to inform her that he was moving from Illinois to Knoxville and that he had several job interviews in the area. In an electronic mail message sent on March 7, 2007, the defendant told the victim that he wanted to spend time with the children but did not want to interfere with her life. The victim testified that the defendant also conveyed his difficulty with knowing that she dated other people. She said that the defendant stated that he wanted to see the children on March 26 because he would be in Knoxville to interview for jobs. The victim said that the defendant, however, never called to solidify any plans.

The victim testified that on Sunday, March 25, 2007, the defendant arrived unannounced at her home before dinner. She said that the children seemed very happy to see him because they had not seen him in more than a month. The victim said that the defendant then stayed while she and the children ate dinner. She explained that the defendant remained at the home "like it was okay for him to stay there." At 9:00 or 9:30 she told him that he needed to leave so she could sleep. The defendant responded that he needed to stay with the victim and use her computer in the morning before his interviews. The victim testified that she gave the defendant a house key so that he could use her computer the next day but that she did not let him stay at the residence. The defendant agreed to leave the key underneath the door mat when he finished.

The victim testified that the defendant wanted to take the children to a movie the following night. She admitted that she had previously agreed to allow him to do that; however, she stated that she began feeling uncomfortable about the defendant's being alone with her children after interacting with him the previous night. She told the defendant via telephone that he could only see the children if she went with them. The victim stated that this angered the defendant. The victim testified that she ultimately did not allow the defendant to see her children that evening. She stated that the defendant had used her computer and returned the key as agreed and that she did not see the defendant on Monday, March 26.

On the following day, the defendant called the victim several times. He told the victim that, if she would meet him for lunch to discuss his seeing the children and to exchange some paperwork involving the divorce, he would "just go." She agreed that the defendant could pick her up where she worked at the Tennessee School for the Deaf ("TSD"). The victim testified that the campus had a security gate, so she arranged with the security guard to allow the defendant to enter the ground of the school. The defendant arrived in his pickup truck, and the victim rode in the front passenger seat.

The victim testified that, when she entered the vehicle, the defendant showed her what appeared to be a letter from a potential employer offering the defendant a job. The victim told the defendant that she was proud of him but that she did not want to resume their relationship. She said that the defendant insisted that he could "fix" the relationship. She testified that, when she argued that their relationship was over, he became angry. She said that the defendant started driving "real fast" on curving roads and that she repeatedly asked him to slow down. The defendant then said, "[I]f you don't care about us, I don't care about us either." The victim said that the defendant then suddenly acted calm again and asked her where she wanted to eat.

The victim testified that the defendant drove to a Sonic Drive-In Restaurant ("Sonic") and that after ordering their lunches, the two resumed arguing. She said that the

defendant asked several questions about a man with whom he thought the victim was romantically involved and that the defendant seemed increasingly upset. She stated that the defendant then grabbed her by the hair and pushed her head against the dashboard several times. She stated that a server then brought the food to the truck and that she attempted to leave the vehicle while he was speaking with the server. The victim stated that the vehicle's door was locked so that she could not leave the truck.

After leaving Sonic, the victim asked the defendant to drive her back to TSD. She stated that the defendant did not appear to be driving toward TSD, and she told him that she needed to return to work because her coworkers would notice her absence. The defendant then drove in the direction of TSD. The victim testified that he then suddenly stopped the vehicle and held the victim down and asked for TSD's telephone number. She stated that the defendant had thrown her mobile telephone out of the window earlier and that he called TSD from his mobile telephone. The defendant told her to report to TSD that she would not be returning to work. Although the victim did not know her work number, the defendant apparently had the number programmed in his telephone. The victim stated that the defendant had pinned her neck down and held the phone next to her ear. She then told Janice Murrell at her office that she would not be returning to work.

She testified that the defendant "was determined that he was going to go to this person who he thought [she] was seeing's work." She refused to tell him where the man worked, which further angered the defendant. The victim testified that the defendant wove through traffic on the interstate while speeding. She also said that at one point the defendant threatened to push her out of the moving vehicle. The victim stated the she wanted to get out of the truck, so she suggested that the defendant drive to her apartment where the two could talk about their relationship issues.

Upon arriving at the apartment complex, the victim asked the defendant to stop at a building near the front of the complex so that she could get her mail. She testified that the defendant stopped the vehicle and that she exited the vehicle and walked toward the mailboxes. The defendant then drove toward the victim's apartment unit to park his truck. The victim explained that she pretended to get her mail but that she then ran down a path behind her apartment building. She testified that she ran by some men installing a security system and that she said to them, "If there is a man that follows me, please call 911." She stated that she did not know whether the men heard her.

The victim then arrived at her apartment and went inside. She testified that the door was unlocked although she could not explain why her unattended apartment was not locked. The victim then locked her door and ran to her home telephone. She testified that the defendant kicked in her front door and grabbed the telephone and pulled it out of the wall. She said that he then grabbed her by the arms and forced her to the living room couch. She

said that the defendant screamed, "Well, you think you can call 911? You think that . . . I'd actually do something to hurt you?" She testified that she was scared and hoped that the security employees outside had heard her and called 9-1-1.

The victim testified that the defendant then started pacing in front of her and asked "if [she] ever knew what it felt like to eat a bullet." She said that the defendant would then wholly change his demeanor and plead with her to "get married and fix this whole thing." The victim testified that the defendant then took the wires used to connect the television and the VCR and wrapped them around her neck. She testified that the defendant then stopped and said, "Well, hurting you wouldn't be good enough. The only way to really get to you would be to hurt one of [the children] and make you watch." The defendant then said that he could make her watch him kill himself.

The victim testified that the defendant moved her to a chair at the dining room table. He asked if she had any duct tape and started "[s]cavenging" through her home. She stated that the defendant found a paring knife and acted as though he would use the knife to hurt himself. The victim testified that he then grabbed her from the chair and stood behind her with the knife to her neck. He led the victim into the bedroom while "talking about how . . . he couldn't believe that [she] didn't understand that he loved them and that–[their] marriage had ended because of an affair, and that he was going to prove to [her] that . . . he really did love [her]." The victim stated that the defendant forced her onto the bed, lifted her skirt, and penetrated her vagina with his penis. She maintained that the intercourse was not consensual; however, she could not recall whether the defendant held the knife to her during the rape.

The victim testified that, after the rape, she walked away from the bed. The defendant then asked where she was going, and she responded that she was going to take a shower. The victim testified that she then undressed and went into the shower. She testified that the defendant soon followed her and that he also entered the shower. At that point, the victim left the shower and obtained the defendant's truck keys from his pants that were lying on the floor. She then dressed in a pair of her jeans that were lying on the floor and the shirt that she had been wearing. The victim testified that she then ran outside the apartment and entered the defendant's truck. She stated that this occurred at approximately 2:00 p.m.

The victim testified that she contacted her friend, Paul Allen, who had helped her in other times of difficulty. She said that she met with Mr. Allen at his apartment, and that the two used Mr. Allen's truck to pick up her children from school. She stated that Mr. Allen called 9-1-1 and gave her his mobile telephone. The victim stated that they arrived at West Hills Elementary School, where her two youngest children attended, at approximately 3:00 p.m. When they arrived at the school, the victim was on the telephone with the 9-1-1 operator. She testified that the 9-1-1 operators had contacted the school and that her children

were waiting for her arrival at the school. The victim testified that when she exited the truck to pick up her children she saw that the defendant had walked from the apartment to the elementary school. She said that the defendant ran after her and that Mr. Allen stood between the two so that she could continue getting her children from inside the school.

After getting her youngest children into the truck with Mr. Allen, they drove to Bearden Middle School, which was on the same road as the elementary school. She explained that, because the schools had recently released their students, the traffic on the road was very slow. The victim testified that she saw the defendant walking towards them along the sidewalk. She explained that they then drove behind Bearden Middle School because her oldest daughter usually exited the back door to walk home.

The victim testified that the defendant arrived at the back of the school first and that he virtually "jump[ed] in front of the truck." She explained that the truck's side mirror struck the defendant and knocked him to the ground. The victim testified that at that point she left the truck to get her oldest child but that, unlike at the elementary school, the school administrators were not prepared so she had to sign her daughter out with a security guard.

The victim said that the school "was going into lockdown mode because they realized that [the defendant] was on the property." She then left with her oldest daughter and got into Mr. Allen's truck. As they were leaving the school, police officers arrived. She explained that she remained online with 9-1-1 operators the entire time and that she ended the call when she saw that police had arrived at the school.

She testified that she "just want[ed] to leave" and did not want to answer questions from the police. She admitted that she initially told the police officers, "Who cares about [pressing] charges. They're safe, and I just want to go." However, she said that once the officers noticed marks on her neck, she explained more about the incident. The State introduced photographs of the victim's depicting injuries to her neck. The victim also testified to bruises on her arms, scratches on her back, bruises underneath her scalp, and a chipped tooth.

At the end of the victim's direct examination, the State introduced several exhibits to corroborate her testimony. These exhibits included the letter that the defendant gave to the victim indicating that he had a job offer and several photographs of the victim's apartment complex. A recording of the 9-1-1 call by the victim was also introduced into evidence and played before the jury.

On cross-examination, the victim acknowledged that she was a "strong person" and that she had some experience with martial arts. Defense counsel asked why the victim never complained of rape during her long telephone call with the 9-1-1 operators, and the

victim responded that she did not want to speak of it in front of her children, who were with her for most of the call. Further, the victim stated that, while dealing with the 9-1-1 operators, her main concern was finding her children. The victim explained that she did not recall many of the events of March 27, 2007, until several days later. She explained that only later did she recall the defendant's using a knife and video cord to harm her.

Defense counsel asked about a series of electronic mail messages sent between the two and inquired whether she had led the defendant to believe she still loved him in the messages. The victim maintained that she did not intend to mislead the defendant into believing that she wanted to resume their relationship but that she said complimentary things to him because the defendant seemed sad and "sounded very suicidal."

The victim denied having a romantic relationship with Mr. Allen, and she maintained that she knew him through a divorce care group. The victim admitted that the defendant had a good relationship with her children and that they often spoke with him over the phone.

Knoxville Police Department Officer Sandra L. Reynolds testified that on March 27, 2007, she was patrolling the west Knoxville area and that she responded to Bearden Middle School. She explained that "[a]pparently, there was a domestic [sic] where they had stated that a woman had been held against her will, and the suspect probably had a gun and was on foot in that area where the school was at." When Officer Reynolds arrived at the scene, she observed Lieutenant Ron Green and the school's resource officer.

Officer Reynolds testified that she spoke with the victim and then arrested the defendant. She also spoke with other officers at the scene who had collected information about the incident. She explained that the victim was nervous, hyper, and scared. The victim began crying several times while speaking with her. Officer Reynolds testified that the victim "just basically couldn't quit talking, like she couldn't get her breath." Officer Reynolds stated that she observed the scratches on the victim's neck and that the victim reported that her head hurt.

Officer Reynolds stated that she attempted to explain to the victim "what we have to offer for victims of domestic violence . . . and told her what was available." She told the victim that the Knoxville Police Department could "walk [her] through" the prosecution of domestic violence. Officer Reynolds testified that the victim decided to prosecute the case. Officer Reynolds testified that, after conducting her interviews, she drove the defendant to jail. On cross-examination, Officer Reynolds denied that she influenced the victim to file charges against the defendant.

David Lee, maintenance supervisor at Westwood Apartments, testified that he repaired the victim's door that was allegedly kicked in by the defendant. Although he could not recall specifically making the repair, Mr. Lee testified that he had to secure the lock latch and re-nail the broken trim. The State introduced his work order form as an exhibit, which reflected that he received the order on March 28, 2007, and completed the repair on March 29, 2007.

On cross-examination, Mr. Lee admitted that he did not know exactly when the door was damaged. He testified that he did not see the victim's running into her apartment on March 27, 2007, but he explained that he performed most of his work on the other side of the apartment complex, nearly two blocks from the victim's apartment.

Janice Murrell testified that in 2007, she served as the administrative secretary for the TSD's superintendent. She explained that the victim was hired on February 15, 2007, as the secretary for the department of student living. She said that the victim was an excellent employee and that, with the exception of March 27, 2007, she had never left for lunch and failed to return.

Ms. Murrell testified that the victim called her on March 27, 2007, and said that she felt sick and would not return from lunch. Ms. Murrell testified that she told the victim that she hoped she would feel better. She stated that she noticed that the victim's vehicle remained parked in the school's parking lot when she left the school that evening.

Ms. Murrell stated that the next day, March 28, the victim came to work and had a conversation with her about the previous day. Ms. Murrell testified that the victim produced a photograph of the defendant to be placed in her file at work. Ms. Murrell stated that the security guard had documented that someone came to the school looking for the victim on March 27, 2007. She further testified that the school allowed the victim some time off after March 27 to handle court matters.

Ms. Murrell said that the victim left her employment with the school for "personal issues" on June 14, 2007. The employment file of the victim reflected that people tried to visit her at the school, although she was no longer employed there, on two occasions. The report reflected that an unidentified woman came to the school asking about the victim on September 25, 2007, and that an unidentified woman and man came to the school looking for the defendant on August 3, 2007.

On cross-examination, Ms. Murrell testified that the school's employees did not log in or out when leaving for or returning from lunch. She also clarified that, when the victim called on March 27, she did not ask whether she could take off the remainder of the day but that the victim simply informed her that she would not return.

Knoxville Police Department Officer Brian Baldwin testified that he received a call for service at Bearden Middle School on March 27, 2007. Officer Baldwin recalled that other officers arrived to the scene before he did. He stated that he saw the victim speaking with Officer Morgan. He said that the victim appeared to be crying and that she was sweating. He observed that the victim's clothes were in disarray. After speaking with other officers, Officer Baldwin discovered that the defendant was present. Officer Baldwin then drove the victim to the judicial commissioner's office for the swearing of a warrant. A video from his cruiser's video camera was shown to the jury depicting the scene.

On cross-examination, Officer Baldwin admitted that no fingerprints were taken from the victim's apartment as part of the investigation. He further testified that nothing from the apartment was analyzed and that no rape kit was performed.

After the State rested, the defense called Dan Knappen, a service advisor for the Kile Dodge dealership. Mr. Knappen inspected the defendant's 2004 Dodge Ram pickup truck on April 25, 2007. He testified that the truck's locks functioned properly, and he maintained that the front passenger's side door could be opened from the inside even when the door lock was engaged. Mr. Knappen further testified that, even when a person physically holds down the door lock, the door may still be opened using the inside handle.

Kathleen Burress, the defendant's sister, testified that she took possession of the defendant's 2004 Dodge Ram a few days after his arrest. She testified that she took the vehicle to Kile Dodge on April 25, 2007, and she maintained that she did not alter the condition of the vehicle in any way. Ms. Burress further testified that she spoke with the victim on March 29, 2007, two days after the incident. She stated that the victim told her that she still loved the defendant and that the victim indicated that she would never let the defendant know how she felt.

On cross-examination, Ms. Burress stated that she had known the victim for five years. She explained that she had lived in Indiana but that she moved to Cleveland, Tennessee, because her daughter had been accepted into the Olympics. She testified that in early March 2007 she randomly saw the victim at Cades Cove in the Smoky Mountains National Park. She admitted that she informed the defendant that she had seen the victim and that the victim had moved to Tennessee.

Blaine Melius testified that he installed fire alarm systems for Fleenor Security. He testified that in March 2007, he and Ernie Gibson worked on a fire alarm system at Westwood Apartments, where the victim lived. He stated that usually only he and Mr. Gibson worked at Westwood Apartments, but he said that on occasion extra crew members would be sent to aid them. He testified that he had no memory of a woman running by him and asking him to call 9-1-1.

-9-

Mr. Gibson also testified that, while working on the Westwood Apartments' fire alarm system, he did not see a brunette woman walk by or express that she needed help. On cross-examination, Mr. Gibson agreed that different companies and workers were constantly at the apartment complex. He also explained that he had difficulty hearing and generally could not understand people unless facing them.

The defendant testified that he worked as a qualified underground diesel mechanic, a certified gasoline mechanic, and a motorcycle mechanic. He testified that he and the victim had been married but that they divorced in October 2007. He explained that following the divorce, he maintained a relationship with the victim and her children. He stated that, at times, his relationship with the victim had been romantic even after the divorce and that the two had spent some nights together.

The defendant testified that he drove to Knoxville on March 25, 2007. He stated that he wanted to see his children and that he had several job interviews on Monday, March 26. He explained that he wanted to move to Tennessee because he had two sisters living in the area. He stated that he left Illinois on the evening of March 24, drove through the night, and arrived in Knoxville during the morning of March 25. The defendant stated that the victim called him before he arrived at her apartment to ask about his location.

The defendant testified that the victim answered the door when he arrived at her apartment and that the children seemed happy to see him. The defendant said that he and the victim had originally planned to go to a movie together "like a family thing." He said that two or three hours after he arrived, they decided not to go to the movies. The victim decided that she wanted to discuss the relationship with the defendant, so the two went to dinner at Cozymel's without the children.

The defendant recalled that the service at the restaurant was very bad and that the manager presented him with a voucher for a free meal. The defense introduced a voucher from Cozymel's as an exhibit. The defendant testified that at dinner the victim suggested that the two "take things slow and easy, and . . . that [they] just needed to see where things were going." He stated that after dinner the two went home and that he spent the night with the victim.

The defendant testified that in the morning the victim's alarm clock did not wake the two and that the victim woke up later than she had planned. He stated that the victim quickly dressed and then woke the children. He said that the victim handed him the keys to the apartment and told him that he could use the computer to prepare for his interviews. The victim then asked him to take the children to school because she needed to leave immediately to get to work on time.

-10-

The defendant testified that as he took the children to school, Kaylee, one of the children, asked the defendant to purchase her school photographs. The defendant then called the victim on her mobile telephone to discuss the correct picture package to purchase. The victim told him what package to buy and that she would reimburse him for the photographs. He maintained that he would not have bought the photographs had the victim not given him permission to do so. The payment slip for the pictures was entered as an exhibit.

The defendant testified that he had three job interviews on Monday, March 26, 2007. He explained that, while he was using the victim's computer that morning to get directions to his interviews, an electronic mail message from Paul Allen "popped up." He testified that he thought that turning off the computer would delete the message, so he handwrote the message on a sheet of paper and left it for the victim. He stated that the message indicated that the victim was in a romantic relationship with Mr. Allen. The defendant testified that he was very surprised to discover this relationship because he thought that he and the victim had been reconciling their relationship. The defendant admitted, however, that he had more interest in reviving the romantic relationship than did the victim.

The defendant stated that he accepted a position as an underground maintenance supervisor at Jefferson City Zinc. He testified that, after finishing the interview, he returned to his truck and that his mobile telephone indicated that he had missed several calls from the victim. The defendant stated that the victim seemed upset and that she told the defendant that he had violated her space and her privacy as a result of his reading her electronic mail. The victim also told the defendant that she had placed his possessions outside in the yard. The defendant testified that the victim told him that he was no longer trusted and that he could not take the children to a movie.

The defendant also testified that he and the victim had lunch on March 26, 2007. He stated that he had picked the victim up from the TSD and went to a restaurant named I Love Pizza. He produced a receipt for $18.40 from the restaurant.

The defendant testified that on March 27, 2007, he called the victim and wanted to discuss placing her children on his insurance and the status of their relationship. He asked the victim whether he could pick her up for lunch, and, after initially refusing the offer, she agreed. The defendant testified that the security guard remembered him from having lunch the day before and that the guard assumed that the victim was the defendant's wife. He then pulled into the school, and the victim entered his truck.

The defendant stated that he first drove to an automatic teller machine ("ATM") because the victim needed cash for an event at her work. The defendant then drove to Sonic. He explained that the victim navigated from the passenger's seat because he was

-11-

unfamiliar with Knoxville. The defendant maintained that he drove with the flow of traffic and did not drive erratically. He stated that they ordered their meals, and that a server delivered the meal to the truck. The defendant stated that the victim paid for lunch because he had paid the previous day.

The defendant testified that he showed the victim a letter from Jefferson City Zinc offering him employment. He hoped to prove that he would move to Knoxville and remain in the children's lives. He testified that the victim seemed surprised at the amount of money he would earn and that she became very quiet. He stated that the victim then said, "Well, there's really nothing that's going to be between us anymore." She told him she had decided to continue her relationship with Mr. Allen. This upset the defendant, especially because he knew that Mr. Allen had not yet been divorced. The two began arguing, and the defendant told the victim to leave the truck. The victim told the defendant that he was acting stupidly, and she refused to leave the truck.

After a few minutes, the defendant drove away from Sonic. He explained that the two had a heated argument while driving the victim back toward TSD. The defendant stated that during the argument he talked about confronting Mr. Allen about the relationship at Mr. Allen's place of employment. He stated that he told the victim that he needed to talk with Mr. Allen and that the victim begged him not to speak with him. He admitted that he pulled the victim's hair during this time. He said that the victim responded by hitting him in the side. The defendant stated that, because of the argument, he paid little attention to the road and began swerving. He testified that at one point he almost crashed his truck and that, after driving back into the correct lane, he grabbed the victim by the neck and pushed her into the passenger side of the truck. The defendant then "told [the victim] to put her seat belt on, that it was getting a little bit carried away and getting a little bit out of hand."

The defendant then pulled into a church's parking lot because he did not know where he was. He testified that he asked the victim "what she exactly wanted to do" after he apologized for grabbing her neck. The victim asked him to take her back to work; however, after driving a while, the victim said, "I can't go back to work like this." He testified that the victim determined that she wanted to return to the apartment. He said that the victim had thrown her mobile telephone out of the window with her lunch during their argument. The defendant testified that he gave his mobile telephone to the victim so that she could call TSD. The victim told her employer that she was sick and was taking the remainder of the day off. The defendant maintained that he did not force her to call.

The defendant then tried to calm the victim because she appeared upset and frightened. He testified that the two acknowledged that they needed to calm down and discuss the situation. When the two arrived at the victim's apartment complex, the victim left the truck to check her mail. The defendant testified that he parked his truck by her

-12-

apartment while she checked her mail. He testified that he walked to the dumpster to throw away the trash in his truck and that he observed the victim walk past some men working on the fire alarm system. He stated that he did not observe the victim say anything to those men in passing. The defendant stated that he saw the victim walk toward her apartment but that he could not see her enter.

The defendant estimated that the victim arrived at the apartment a minute or two before him. The defendant testified that he then walked to the front door of the apartment because he thought he was welcome to the apartment to continue their conversation. He said, "I went ahead and opened the door. Upon me getting ready to open the door, I heard something go click, and as I was pushing on the door, the inside facing of the door broke." He said that the victim told him that she debated whether to lock the door. The defendant thought that the victim may have been "setting [him] up . . . to put [him] in jail."

The defendant testified that, after entering the apartment, the victim never asked him to leave. He stated that the two discussed the children and whether they should hire a babysitter to watch the two youngest children because they arrived home from school 30 minutes before the oldest. He testified that this again turned into an argument and that the two raised their voices. The defendant testified that the victim said, "You need to shut the hell up and sit down." He stated that the two then sat on the couch and started talking "civilly" about the children and about Mr. Allen. The defendant testified that the victim told him she was confused and that she still loved the defendant but did not want him to know. He said that the victim told him that she wanted to remain in the relationship with Mr. Allen but that she wanted the defendant to remain in her children's lives.

The defendant testified that the two began talking about the possibility of getting remarried and that the victim told him that "she was really into her Christianity now and that she would want a church wedding." He said that the victim then started crying and the two hugged. He testified that the two then started kissing and that "[i]t got really heated." He testified that the two went to the bedroom and had consensual intercourse. The defendant maintained that he never used a knife or any weapon to force the victim to have sex with him. He said that after the two had sex, the victim immediately went to take a shower.

The defendant stated that he joined the victim in the shower approximately eight to 12 minutes later. The victim then left the shower before he was finished. The defendant testified that he thought that their relationship was in a good place at that point. The defendant testified that he then heard the front door of the apartment slamming shut approximately three or four minutes after the victim left the shower. The defendant then heard his truck's engine start, and he dressed and noticed that his keys were missing. The defendant testified that, because his mobile telephone was inside his truck, he used the

apartment telephone to call his telephone hoping to contact the victim. He said that the victim did not answer his telephone calls.

The defendant knew that it was near the time that the victim's children were released from school, so he reasoned that the victim took his truck to pick up the children. The defendant decided to walk toward the two youngest children's elementary school. He explained that the weather was warm, so he got a drink of water upon arriving at the school. He testified that he then saw a white Ford F-350 pickup truck pull up and that Mr. Allen and the victim exited the truck. He testified that the two were holding hands and walking to the front of the school. He testified that the victim was talking on a mobile telephone.

The defendant acknowledged that, when he raised his voice, he could appear intimidating, and he admitted raising his voice toward the victim several times on March 27, 2007.

On cross-examination, the prosecutor pointed to several discrepancies between the defendant's telephone records and his account of the events. The defendant also explained that he returned to the victim's apartment on March 26 despite knowing that she was upset with him for checking her electronic mail. He noticed that not all of his possessions had been placed on the lawn, so he used the house key to enter the apartment and collect the remainder of his possessions. He then drove to Cleveland, Tennessee, to stay with his sister. The defendant also explained that on March 27, 2007, he walked to Bearden Middle School because he hoped to find his truck, which held everything that he owned.

The assistant district attorney general also asked the defendant questions regarding an order of protection filed against him by the victim, which we discuss later in this opinion.

Gary Wayne Parker testified that he spent 17 years as an investigator for the District Public Defender's office and that he had also worked for the Knox County Sheriff's Department and the Knox County District Attorney General's office. He testified that he took statements from Mr. Melius and Mr. Gibson of Fleenor Security, Ms. Murrell of TSD, and Mr. Lee of Westwood Apartments, as part of his investigation. He also reviewed the grounds of the apartment complex. Mr. Parker also visited various ATMs that might have been visited by the defendant and victim before lunch at Sonic.

The defense rested, and the State called Officer Reynolds as a rebuttal witness. She testified that, when she spoke with the defendant on March 27, 2007, the defendant admitted to her that he held the victim against her will at the apartment "so that they could discuss issues about the relationship." On cross-examination, Officer Reynolds testified that

-14-

she referred the case to the department's detectives but did not know whether they completed an investigation.

The State then recalled the victim. The victim testified that she and the defendant never went to Cozymel's on March 25, 2007, and she maintained that she would never leave her children unattended at night as the defendant alleged. The victim denied the defendant's assertion that he took her children to school, that she called the defendant repeatedly, and that she went to a pizza restaurant with the victim on March 26, 2007. The defendant also testified concerning an order of protection she obtained against the defendant.

Based upon the evidence as summarized above, the jury convicted the defendant of one count of aggravated kidnapping, two counts of kidnapping, and one count of aggravated criminal trespass. The jury acquitted the defendant of the rape charge. The trial court merged the kidnapping convictions into the conviction of aggravated kidnapping. After a sentencing hearing, the court ordered the defendant to serve nine years' incarceration as a violent offender.

*Issues on Appeal*

The defendant presents three issues on appeal that allege the misuse of prior bad act evidence at trial. First, the defendant argues that the trial court erred "in permitting testimony regarding prior bad acts allegedly perpetrated by the accused against the alleged victim." Next, the defendant argues that the assistant district attorney general improperly questioned the defendant and victim regarding the prior bad acts. Last, the defendant argues that the trial court erred in overruling his motion for a mistrial. Before we develop our analysis of these issues, first we must explain the somewhat complicated manner in which the alleged Tennessee Rule of Evidence 404(b) testimony surfaced at trial.

*Prior Bad Act Testimony*

Near the end of the defendant's direct examination, his attorney asked whether he had ever had an order of protection or restraining order filed against him. The defendant responded that the victim had obtained an order of protection against him in Indiana while they were still married. He said, "We were legally getting ready to be separated, and [the victim] . . . had filed for order of protection and filed for divorce." The defendant stated that the order was never served on him because an incorrect address had been listed. He maintained, "I didn't know anything about the restraining order 'cause [the victim] and I were still talking with each other and still seeing each other." He said that he first learned of the order when the victim called him to ask if he was attending the court hearing for the order of protection.

During cross-examination of the defendant, the State's prosecutor asked the defendant whether he recalled why the victim obtained the order of protection against him on August 8, 2006. The defendant responded that he "would probably need to look at it" because he only recalled that the two had a "big argument . . . due to the fact of our divorce [and] that [the victim] accused [him] of having an affair that [he] didn't have." The assistant district attorney general then asked whether the defendant recalled an incident on July 29, 2006, where he argued with the victim, "grabb[ed] her by the hair and slamm[ed] her into the wall and ma[de] the statement that [he] wish[ed] that she was dead." The defendant denied that he slammed the victim's head into a wall, but he admitted that he grabbed her hair and that he told her that he wished she was dead because "she was destroying [his] life."

The assistant district attorney general then asked if the defendant recalled a confrontation with the victim on July 30, 2006, when he threw the victim to the floor and repeatedly struck her head "trying to make sure that she and the children were unable to leave the situation." The defendant stated that he did not remember any such incident.

The assistant district attorney general then asked about an incident on August 6, 2006. The prosecutor asked whether the defendant recalled arriving unannounced at the victim's home, "busting through a plate glass door," striking the victim, and forcing the victim to engage in sexual intercourse. The defendant wholly denied this incident, and he explained that he had keys to the house and would not have to forcibly enter. He explained that he and the victim did have a confrontation and that the victim told him that she had called 9-1-1. He testified that police officers arrived at the door and that he told the officers that he would leave the home. He stated that he told the officers that the two "were having a confrontation and it was getting out of hand." The prosecutor asked whether he recalled threatening the victim with a knife on that occasion, and the defendant responded, "I believe there was some talk of me threatening with . . . a knife. I'm not for sure about that 'cause I don't remember it."

During the State's rebuttal proof, the assistant district attorney general asked the victim about the order of protection issued August 8, 2006. The prosecutor first asked the victim to describe an incident on July 29, 2006, and the victim said,

> That day I had confronted [the defendant] with several phone calls from another woman calling his phone when he arrived home. Previously he had denied this, and I had printed some things out, and . . . I just wanted him to acknowledge that this was somebody that he was seeing or talking to at that time a lot. He got angry about the number that I had printed out, and when I showed him, . . . it showed that he had repeatedly spoke to someone for his commute 45 minutes to work and 45 minutes

-16-

home, he spoke to this same number many times, and during an argument, he grabbed me by the hair, and he slammed me against the wall and made a statement wishing that I was dead.

The victim stated that she did not call the police as a result of this incident because she did not think that the defendant was a violent person at that time.

The victim testified that on the next day she and the defendant had another confrontation where the defendant "threw [her] to the floor . . . with force, repeatedly hit [her] in the head, trying to make sure that the children and [her] were unable to leave" because she had attempted to leave the house.

The assistant district attorney general then asked about an incident on August 6, 2006,  to which defense counsel, for the first time, objected to "these things" as inadmissible evidence pursuant to Rule 404(b) of the Tennessee Rules of Evidence.  Out of the presence of the jury, the trial court agreed that the August 6, 2006 allegation of forced sexual intercourse was "404(b) type evidence" but pointed out that defense counsel initially addressed the order of protection.  The trial court stated that it was "taken aback" by the prosecutor's questioning the defendant about the alleged 2006 rape on cross-examination, but he noted that defense counsel made no objection.

The trial court then heard the victim's putative testimony outside of the presence of the jury.  The victim testified that, after the aforementioned incidents, she and the defendant agreed that she would live at the marital residence and care for the children and that the defendant would live at his father's home.  The defendant agreed that he would call before coming to the home if he needed anything.  She testified that on August 5, 2006, she had a stressful night and "turned off all the phones in the house."  She stated that the next morning she saw the defendant driving quickly toward the home on the gravel driveway. She testified,

[A]s soon as I saw his truck and he did not call like we agreed, I called 911.  As he came in the door the phone was behind my back, . . . they recorded most of . . . what happened that day, but there was a spot where . . . he's saying that, in having sex with me, he just . . . wants me to know that he has not had an affair, and he's trying to prove that he loves me by doing this, but it was against my will.

The victim further explained that the defendant broke through the glass on a screen door to get inside.  She stated that the defendant possessed a key to the home but that he still broke through the door.  The defendant told her that he was angry because the victim

-17-

did not allow him to call one of the children to wish him a good night and that he worried all night about the children. The victim testified that her children were home at the time and that they exited the back of the house and then went toward the front yard. She said, "[O]ur altercation ultimately ended with me being in the kitchen with my back against like a kitchen island, my hands were on top of it, and he had grabbed in the drawer a kitchen knife, and when he saw the police show up, he slammed it by my hand." She testified that this incident led her to get the order of protection.

The trial court determined that the victim would not be permitted to testify to the details of the August 6, 2006 incident. The trial court reasoned that the prosecutor could ask about the situation because the defendant denied the allegations during the cross-examination of the defendant. The court said, "I'm going to allow you to ask her if on a prior occasion before she took out the order of protection was there ever an occasion on which . . . he forcibly entered the residence and . . . required her to engage in unconsensual [sic] activity." The trial court forbade the prosecutor to go into details of the incident.

Defense counsel then asked for a mistrial "based on this illegal 404 evidence coming in." The trial court responded that no basis for such a motion would exist until the evidence actually came before the jury. The jury then reentered the courtroom and the prosecutor asked,

> Q    Ms. Riley, on a previous . . . occasion prior to the order
> of protection that was taken out in August 2006, did the
> defendant have the occasion to bust through your door
> and force you to engage in nonconsensual intercourse?
>
> A    Yes, ma'am, he did.

On cross-examination, the victim admitted that the August 2006 event occurred while the two remained married, although they were separated. She explained that the defendant's attorney included as part of the divorce decree that the order of protection would be dismissed upon the finalizing of the divorce. She explained that at that point the order of protection was not needed because he had moved three hours away to Maryville, Illinois.

*I. Cross-Examination Regarding Prior Bad Acts of the Defendant Toward the Victim*

The defendant avers that the trial court erred "in allowing testimony regarding prior bad acts of the defendant committed against the alleged victim." The State argues that the defendant has waived this issue by failing to make a contemporaneous objection. *See* Tenn. R. Evid. 103(a)(1) (stating that error may not be predicated upon a ruling which admits evidence if no timely objection is presented); Tenn. R. App. P. 36(a) ("Nothing in this rule

-18-

shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We agree with the State.

First, we note that the record reflects that an order of protection obtained by the victim against the defendant in 2006 referenced three instances of the defendant's assaulting the victim in some form. The order of protection was first mentioned by defense counsel during his direct-examination of the defendant. On cross-examination, the assistant district attorney general asked about specific instances including a July 29, 2006 argument resulting in an assault on the victim, a July 30, 2006 argument resulting in the defendant striking the victim's head repeatedly, and an August 6, 2006 alleged rape of the victim involving a knife. During this questioning the defendant generally denied the allegations; however, we note that counsel failed to object.

Because the defendant failed to object, we will only determine whether the State's questioning into specific instances of prior bad conduct constituted plain error. *See* Tenn. R. App. P. 36(a),(b). Before plain error pursuant to Rule 52(b) of the Rules of Criminal Procedure may be so recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). The word "'plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the [reviewing court], and the court should not exercise that discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id*. at 732, 113 S. Ct. at 1776 (citations and internal quotation marks omitted) (second alteration in original).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the standard announced by this court in *Adkisson*. There, we defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature." *Adkisson*, 899 S.W.2d at 639. Our supreme court also adopted *Adkisson*'s five factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and

-19-

(e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before [a reviewing court] will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. Our supreme court also observed that "the 'plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (internal quotation marks omitted).

First, we must consider whether evidence of the instances on July 29, July 30, and August 6, 2006, constituted prior bad act evidence pursuant to Tennessee Rule of Evidence 404(b). Evidence of other crimes, wrongs, or acts is not generally admissible to prove that an accused committed the crime in question. Tenn. R. Evid. 404. The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005). The risk is greater when the defendant's other bad acts are similar to the crime for which the defendant is on trial. *Id.* at 239; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

Notwithstanding the general rule, evidence of other crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). To admit such evidence, the rule specifies the following:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

-20-

Tenn. R. Evid. 404(b)(1)-(4).

The three specific acts of domestic abuse alleged in the order of protection constitute the type of evidence meant to be excluded pursuant to Rule 404(b). The July 29 and 30 assaults involved the defendant's threatening and striking the victim. The August 6 incident involved the defendant's breaking through a door and forcing the victim to have sexual intercourse. In the present case, the prosecution's theory of the case involved the defendant's threatening, striking, kidnapping, and raping the victim. The three instances of prior bad acts brought forth by the prosecution involved the same criminal conduct and certainly risked the danger of showing the defendant's propensity to commit similar future crimes.

However, the introduction of this evidence does not amount to plain error. We cannot say the prior bad act evidence was overly prejudicial or that it seriously affected the outcome of the trial. Although the specific instances leading to the order of protection certainly could have influenced the jury to convict the defendant, the jury apparently did not view this evidence in an unfair light. First, we note that, even in light of the August 6, 2006 rape allegation, the jury fully acquitted the defendant of the rape charge. Also, the jury did not convict the defendant of the aggravated burglary charge that was related to the alleged rape. The jury instead chose the lesser-included offense of aggravated criminal trespass. The jury also chose a lesser-included kidnapping charge rather than the count alleging aggravated kidnapping to facilitate the commission of the rape. Further, we note that the State's theory that the defendant used a knife to force non-consensual sex with the victim was rejected by the jury's electing not to convict the defendant of especially aggravated kidnapping by use of a deadly weapon.

Viewing all the evidence, we cannot see how the Rule 404(b) evidence adversely affected the defendant. The incidents in the order of protection merely reflected allegations made by the victim in 2006 and should not have clouded the jury's judgment in determining the merits of her allegations in the present case. The jury only convicted the defendant of aggravated criminal trespass and of the aggravated kidnapping of the victim by causing bodily harm. In light of the entire body of evidence, we observe that these charges were clearly proved outside of any prior bad act evidence. Officer Reynolds testified that the defendant explicitly admitted to her that he held the victim at the apartment against her will. Photographs showed the kicked-in door and the injuries to the victim's neck, and the defendant testified that he assaulted the victim. The record shows that the jury determined its verdict based on weighing the evidence and that it did not unfairly use the prior bad act evidence against the defendant.

*II. Rebuttal Testimony Regarding Prior Bad Acts of the Defendant Toward the Victim*

-21-

The prior bad act evidence resurfaced during the State's rebuttal proof when the prosecutor asked the victim about the three incidents to impeach the defendant. The prosecutor asked the victim about the July 29 and 30, 2006 altercations, and the victim gave full accounts of the assaults. When the assistant district attorney general inquired into the August 6, 2006 rape, defense counsel objected. After a jury-out hearing of the testimony, the trial court determined that the discussion of the August 6, 2006 incident would simply be limited to the purpose of impeaching the defendant's denial that he broke into her home and forced her to engage in intercourse against her will. The court prohibited the prosecutor from asking about specific facts of the incident.

First, we again note that defense counsel failed to object to the July 29 and 30 conflicts, and, according to our above analysis, such testimony does not amount to plain error. However, defense counsel timely objected to the August 6 rape allegation. At this point, the defense argued that the victim's account of August 6 was precluded by Rule 404(b). The court agreed that the August 6 incident was Rule 404(b)-type evidence; however, it allowed a restricted explanation of the event in order to impeach the defendant who denied the incident on cross-examination.

We discern that the prosecutor intended to use the victim's testimony about the August 6 rape allegation as fact contradiction to impeach the defendant through rebutting his denial of her allegations. However, impeachment of a witness through fact contradiction is subject to the collateral evidence rule. *State v. Perkinson*, 867 S.W.2d 1, 6 (Tenn. Crim. App. 1992). "According to this rule, there can be no extrinsic proof of collateral matters[,] . . . [and] counsel must accept the witness' response, even if it is a denial that counsel could disprove." *Id.* (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 607.3 (2d ed. 1990)). A collateral fact is one which has no relevance except that it contradicts something said in court, and a fact is not collateral "if it is relevant independent of any contradiction." Neil P. Cohen et al., *Tennessee Law of Evidence* § 607[4][c] (5th ed. 2005). Here, the alleged August 6, 2006 rape of the victim at first glance purports to be substantive evidence directly related to substantive issues at the trial; however, because Tennessee Rule of Evidence 404(b) serves to bar such proof as substantive evidence, the August 6 incident is effectively a collateral issue. Thus, the prosecutor should not have been permitted to use fact contradiction through extrinsic proof of the victim's testimony.

Further, our review of the record reveals that, upon the defendant's timely objection, the trial court failed to instruct the jury that the August 6 incident could only be considered as impeachment, and not as substantive evidence. *See State v. Harry David Johnson*, No. 03C01-9712- CR-00526, slip op. at 15-16 (Tenn. Crim. App., Knoxville, May 17, 1999) (explaining that when fact contradiction evidence also contains prior bad act

evidence, the trial court should instruct the jury to only use the evidence for impeachment purposes and not as propensity evidence).[1]

Nevertheless, in the face of the petitioner's objection, we hold that the trial court erred by permitting this testimony with or without any limiting instruction. The prosecutor properly recalled the victim to rebut the testimony of the defendant regarding the facts of the case; however, the prosecutor exceeded the scope of rebuttal by asking the victim to explain specific instances of conduct leading to the order of protection. This error notwithstanding, we also hold that the trial court's error was harmless. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). We cannot say that the unnecessary and improper recitation of the August 6, 2006 rape allegation "more probably than not" affected the jury's verdict. First, we note that the defendant had already been cross-examined on the allegation from the order of protection and that the jury had already been presented with the information. Second, we note that, in line with our plain error analysis above, the jury's rejection of all charges involving the rape of the victim shows that the inadmissible testimony did not prejudice the defendant.

### III. Prosecutorial Misconduct

The defendant next argues that the assistant district attorney general's improper questioning regarding the Rule 404(b) evidence amounted to prosecutorial misconduct. Once more, the defendant failed to contemporaneously object to the prosecutor's alleged abuse. *See* Tenn. R. Evid. 103(a); Tenn. R. App. P. 36(a). Further, the defendant's motion for new trial does not allege any prosecutorial misconduct. *See* Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). As such, we treat the defendant's argument as waived, and we discern that no plain error exists based upon our reasoning that the defendant did not suffer prejudice as a result of the inappropriate evidence introduced by the prosecutor. *See State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App.

---

[1]Neither party argued that evidence of the August 6 incident was presented as impeachment under Rule 608 of the Tennessee Rules of Evidence. This rule allows for specific instances of conduct to be used for the purpose of attacking a witnesses' character for truthfulness. *See* Tenn. R. Evid. 608(b). We note that the rape allegation is not an indicia of untruthfulness and that extrinsic evidence may not be presented for Rule 608 impeachment. *Id.*

1990) (stating that this court reviews allegations of prosecutorial misconduct to determine "whether such conduct could have affected the verdict to the prejudice of the defendant").

## *IV. Motion for Mistrial*

Lastly, the defendant argues that the trial court erred by failing to grant his motion for mistrial. First, we note that a close reading of the record shows that defense counsel failed to make a timely motion. Counsel moved for a mistrial during the jury-out discussion of whether the victim's testimony of the specific instance of the August 6, 2006 alleged rape should come before the jury. At that point, the trial court noted that defense counsel's motion for mistrial was premature because the jury had not yet heard the victim's testimony regarding the incident, and counsel responded that he would renew his motion after the testimony. A review of the record shows that defense counsel failed to renew his motion after the victim testified about the August 6 incident. *See* Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a). Further, the defense attorney failed to include this issue in his motion for new trial. *See* Tenn. R. App. P. 3(e); *Martin*, 940 S.W.2d at 569. We treat this issue as waived.

## *V. Conclusion*

In light of the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE