# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### OCTOBER SESSION, 1997

FILED

February 6, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 03C01-9612-CC-00462 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | JEFFERSON COUNTY |
| VS. | ) | |
| | ) | HON. WILLIAM R. HOLT, JR. |
| WILLIAM DEARRY, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Rape of a Child) |

## ON APPEAL FROM THE JUDGMENT OF THE
## CIRCUIT COURT OF JEFFERSON COUNTY

FOR THE APPELLANT:

LU ANN BALLEW
Assistant Public Defender
Fourth Judicial District
P.O. Box 416
Dandridge, TN 37725

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

SANDY R. COPOUS
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

AL SCHMUTZER, JR.
District Attorney General

JAMES L. GOSS
Assistant District Attorney General
P.O. Box 70
Dandridge, TN 37725

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, William Dearry, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure.  He was convicted by a Jefferson County jury of one count of rape of a child.[1]  The trial court sentenced him to fifteen years imprisonment with the Department of Correction.  In this appeal, the Defendant presents five issues for review:

> (1) That the indictment was fatally defective in that it did not sufficiently allege the mens rea necessary for conviction;
> (2) that the trial court erred in denying his motion for an inpatient mental evaluation;
> (3) that the trial court erred in admitting his statement at trial;
> (4) that the trial court erred in permitting the State to pose leading questions to the child victim at trial; and,
> (5) that the trial court erred in failing to require the State to elect the proof relied upon to sustain the conviction.

After reviewing the record, we conclude the Defendant's issues lack merit and affirm the judgment of the trial court.

Although the Defendant does not specifically challenge the sufficiency of the evidence, we begin with a summary of the pertinent facts.  In January of 1995, the Defendant was living with the victim, T.R., and her mother.[2]  The Defendant was dating the victim's mother.  The victim was nine years old at this time.  In early February of 1995, the victim complained of sexual abuse to Department of Human Services ("DHS") officials.  She was interviewed by Penny Inman, a counselor with DHS, at her elementary school and identified the

---

[1] Tenn. Code Ann. § 39-13-522.

[2] It is the policy of this Court not to refer to child victims of sexual offenses by name.  In this opinion, we will refer to the victim as "T.R." or simply as "the victim."

Defendant as the perpetrator of the sexual abuse. The Defendant was subsequently interviewed by police and arrested on charges of rape of a child.

Given the youth of the victim, the facts adduced at trial relating to the allegations of sexual abuse were, not surprisingly, vague at times. At trial, the prosecutor asked the victim, "did he [the Defendant] touch you in some way that was bad?" In response to this open-ended question, the victim testified in general terms that the Defendant touched her "private parts" with his hands and had her touch his "private parts." After this testimony, however, the prosecutor was clearly interested in eliciting details of a particular incident. Over the Defendant's objection, the trial court permitted the prosecutor to direct the victim's attention to an incident which allegedly occurred after school had begun again following the 1994-1995 Christmas break but before she spoke with Penny Inman on February 3, 1995. The victim's mother had apparently gone to Georgia. The victim testified in greater detail about this occasion, stating that the Defendant took her into a bedroom of their home and showed her books containing sexually explicit photographs. The Defendant told her to do what the individuals in the pictures were doing. As a result, the victim "licked" the Defendant's penis.

On cross-examination, the victim admitted that she told the doctor who first examined her that the Defendant had put his fingers inside her vagina and had penetrated her vagina with his penis. On redirect examination, the victim clarified that statement, testifying that the Defendant had tried to put his fingers and penis in her vagina, but she had "pretty much" stopped him from doing so.

The State also offered the testimony of Bud McCoig, a detective with the Jefferson County Sheriff's Department. McCoig testified that, on February 3, 1995, he took a statement from the Defendant regarding the allegations of sexual abuse. A redacted version of the statement was read into evidence at trial:

> I [the Defendant] need help. I'm on disability. I can't work. T[.R.] excites me but not all the time. I'm getting to where in [sic] won't rise on me. I need help because T[.R.]'s exciting me sexually.
>
> It's been about a month ago. She had her clothes off. I unzipped my pants. I rubbed my penis on her vagina when I started to come I jerked it back and caught the come in a rag. She also licked my penis down the side of it. I hadn't come at that time but I had a hard on.
>
> When T[.R.] was licking my penis she put her mouth over the side of my penis. Then I jerked back.
>
> It happened on the bed, mine and Janie's. She had her clothes off. Janie had gone to get her brother at that time.

Because the Defendant was illiterate, McCoig made the written account of what the Defendant said, read the statement back to the Defendant, and the Defendant then signed it.

The Defendant presented the testimony of Dr. John Ellis. Dr. Ellis examined the victim on February 3, 1995. Ellis testified that he performed a cursory physical examination in response to allegations of sexual abuse. The examination revealed no evidence of vaginal penetration of the victim. On cross-examination, Ellis testified that his findings were limited to vaginal penetration. He stated that he could not determine if the victim had been penetrated orally or if the victim's vagina had merely been touched on the exterior.

The Defendant testified in his own behalf at trial. He stated that he had once accidentally touched the victim's vagina while picking her up, but he denied the allegations of sexual abuse. More specifically, he denied the alleged incident

of oral penetration as well as ever having penetrated the victim's vagina. With regard to his statement to Detective McCoig, the Defendant testified that he simply could not remember what he had told McCoig. On cross-examination, the Defendant stated that although he could not remember what he had told McCoig, he was sure that he had told the truth.

The Defendant was indicted on one count of rape of a child. He was tried on October 31, 1995. After considering the proof presented at trial, the jury found the Defendant guilty as charged. He now appeals his conviction to this Court.

In his first issue on appeal, the Defendant argues that the indictment charging him with rape of a child was fatally defective in that it did not sufficiently allege the mens rea necessary to sustain a conviction. He cites a recent decision of a panel of this Court that held an indictment invalid which charged the offense of aggravated rape in language similar to that in the case sub judice. See State v. Roger Dale Hill, C.C.A. No. 01C01-9508-CC-00267, Wayne County (Tenn. Crim. App., Nashville, June 20, 1996), rev'd, 954 S.W.2d 725 (Tenn. 1997). The Defendant contends that because the indictment charging him with rape of a child failed to allege the requisite mens rea, his conviction for that offense is void.

It is well-established in Tennessee that an indictment or presentment must provide notice of the offense charged, an adequate basis for the entry of a proper judgment, and suitable protection against double jeopardy. State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996); State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991); State v. Lindsay, 637 S.W.2d 886, 890 (Tenn. Crim. App. 1982). The indictment "must state the facts in ordinary and concise language in a manner that would

enable a person of common understanding to know what is intended, and with a degree of certainty which would enable the court upon conviction, to pronounce the proper judgment." Warden v. State, 381 S.W.2d 244, 245 (Tenn. 1964); Tenn. Code Ann. § 40-13-202.

A lawful accusation is an essential jurisdictional element, and thus, a prosecution cannot proceed without an indictment that sufficiently informs the accused of the essential elements of the offense. State v. Perkinson, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992); State v. Morgan, 598 S.W.2d 796, 797 (Tenn. Crim. App. 1979). A judgment based on an indictment that does not allege all the essential elements of the offense is a nullity. Warden, 381 S.W.2d at 245; McCracken v. State, 489 S.W.2d 48, 53 (Tenn. Crim. App. 1972).

Furthermore, the Tennessee Code provides that "[i]f the definition of an offense within this title does not plainly dispense with a mental element, intent, knowledge, or recklessness suffices to establish the culpable mental state." Tenn. Code Ann. § 39-11-301(c). The definition of rape of a child neither specifies nor plainly dispenses with a mental element. Tenn. Code Ann. § 39-13-522. Thus, pursuant to Tennessee Code Annotated section 39-11-301(c), the mental element is satisfied if proof establishes that the proscribed act was committed with intent, knowledge or recklessness.

Relying on this Court's opinion in State v. Roger Dale Hill, the Defendant contends that the indictment in the present case fails to allege a reckless, knowing or intentional mental state. As a result, he argues that the failure to

allege the requisite mental state renders the indictment fatally defective and his conviction void. The indictment in the case at bar reads as follows:

> The Grand Jurors for the State of Tennessee, having been duly summoned, elected, impanelled, sworn and charged to inquire for the body of the County and State aforesaid, present, that William D. "Buddy" Dearry on the ___ day of January, 1995, before the finding of this indictment, in the State and County aforesaid, did unlawfully, feloniously sexually penetrate [T.R.], a person less than thirteen (13) years of age, in violation of T.C.A. Section 39-15-522 [sic], contrary to the statute, and against the peace and dignity of the State of Tennessee.[3]

As the Defendant points out, the indictment does not specifically refer to the required mental state as intentional, knowing or reckless.

Our supreme court recently provided guidance on this issue in its opinion reversing this Court's decision in Hill. The supreme court stated that:

> for offenses which neither expressly require nor plainly dispense with the requirement for a culpable mental state, an indictment which fails to allege such mental state will be sufficient to support prosecution and conviction for that offense so long as
>
> > (1) the language of the indictment is sufficient to meet the constitutional requirements of notice to the accused of the charge against which the accused must defend, adequate basis for entry of a proper judgment, and protection from doubly jeopardy;
> > (2) the form of the indictment meets the requirements of Tenn. Code Ann. § 40-13-202; and
> > (3) the mental state can be logically inferred from the conduct alleged.

State v. Hill, 954 S.W.2d 725, 726-27 (Tenn. 1997).

Applying these principles to the charging instrument in the case sub judice, we conclude that the indictment is not fatally defective. The indictment satisfies

---

[3] The indictment refers to Tennessee Code Annotated section 39-15-522. The statutory provision regarding rape of a child is actually contained at section 39-13-522. Prior to the point at which jeopardy attached, the prosecutor noticed the typographical error and the trial court ordered that the indictment be amended to reflect the correct statutory provision.

the constitutional notice requirements. It provided adequate notice that the Defendant was charged with the statutory offense of rape of a child as codified in Tennessee Code Annotated section 39-13-522, which contained the essential elements of the offense. Here, too, is sufficient information by which the trial judge could have pronounced judgment for that offense. Finally, the Defendant is adequately protected against a second prosecution for the offense of rape of a child committed against T.R. during the month of January, 1995.

Regarding the requirement that the form of the indictment satisfy the statutory provisions of Tennessee Code Annotated section 40-13-202, it is readily apparent that the indictment was drafted such that a person of ordinary intelligence could understand with what offense he or she was charged. The language of the indictment clearly tracks the language of the statute defining the criminal offense of rape of a child.

Likewise, the third requirement, that the mental state be logically inferred from the indictment, has been satisfied. One can infer the required mental state of recklessness, knowledge, or intent from the nature of the charged criminal conduct, namely that the Defendant "did unlawfully, feloniously sexually penetrate [T.R.], a person less than thirteen (13) years of age." See Hill, 954 S.W.2d at 729. Accordingly, we conclude that the indictment in the case at bar meets the constitutional and statutory requirements of notice and form and is therefore valid. The Defendant's first issue on appeal lacks merit.

In his second issue on appeal, the Defendant argues that the trial court erred in denying his motion for an inpatient mental evaluation. He challenges the

trial court's ruling in two respects. First, he contends that the results of his outpatient evaluation indicated that an inpatient evaluation was needed to ensure that he was competent to stand trial. Second, he contends that an inpatient evaluation was necessary because the results of the outpatient evaluation did not sufficiently answer the question of whether his mental illness rendered him substantially incapable of conforming his conduct to the requirements of the law, as is required under State v. Graham, 547 S.W.2d 531, 543 (Tenn. 1977).

Prior to trial, upon a petition by defense counsel, the trial court ordered that the Defendant undergo an outpatient forensic evaluation to determine his competency to stand trial and his mental condition at the time of the alleged offense. See Tenn. Code Ann. § 33-7-301(a). Dr. Jeffrey Munson, a clinical psychologist with Cherokee Health Systems, conducted the outpatient evaluation on July 20, 1995. The outpatient evaluation consisted of a clinical interview lasting approximately two hours. No psychological testing was performed. Dr. Munson did, however, review records of other psychological evaluations performed on the Defendant in 1992 and 1993 as well as the Defendant's scholastic records.

The records which Dr. Munson reviewed indicated that the Defendant underwent a psychological evaluation in July of 1992 to determine his capacity to serve as a parent. Psychological testing was performed as part of this evaluation. These tests revealed that the Defendant had a verbal IQ of 59, a performance IQ of 63, and a full-scale IQ of 58, placing him in the mildly mentally retarded range of intellectual functioning. The Defendant underwent another psychological evaluation in July of 1993 to determine his eligibility for disability

benefits. A wide variety of psychological tests were again performed as part of this evaluation. These tests revealed that the Defendant had a verbal IQ of 67, a performance IQ of 67, and a full-scale IQ of 66, again placing him in the mildly mentally retarded range of intellectual functioning. The tests revealed no evidence of psychosis, and the Defendant's thought processes were generally conventional and concrete.

After conducting the outpatient evaluation, Dr. Munson filed a report with the trial court concluding that the Defendant was competent to stand trial and that an insanity defense could not be supported. Dr. Munson noted that although the Defendant was legally competent to stand trial, his competence was "minimal." Accordingly, Dr. Munson stated that an additional, inpatient evaluation of the Defendant "might yield additional information of value in this 'close call' type of case."

On October 19, 1995, the Defendant filed a motion for an additional, inpatient evaluation, asserting that the results of the outpatient evaluation were not sufficient to determine the Defendant's competency to stand trial or his mental condition at the time of the offense. The trial court conducted a hearing on the motion on October 23, 1995. The only witness to testify at the hearing was Dr. Munson, the clinical psychologist who conducted the Defendant's outpatient evaluation. Dr. Munson's testimony primarily reiterated the results of the outpatient evaluation. He testified that he had reviewed the Defendant's scholastic records as well as records of recent psychological testing. The outpatient evaluation itself consisted of a two-hour clinical interview. Based on the review of the records and the outpatient evaluation, Dr. Munson testified that

the Defendant was suffering from mild mental retardation. Dr. Munson concluded, however, that the Defendant was minimally competent to stand trial and that, in spite of his mental retardation, the Defendant was able to differentiate right from wrong at the time of the alleged offense.

Upon further questioning, Dr. Munson stated that a thirty-day inpatient evaluation might be helpful in determining the Defendant's competency and sanity because it stood "a good chance of yielding additional information." In particular, Dr. Munson testified that a neuropsychological evaluation, which would include a wide variety of tests to assess cognitive processes, might be helpful because the Defendant reported that he had suffered head injuries as a child. In addition, Dr. Munson stated that the Wechsler Adult Intelligence Scale - Revised test might be helpful to assess changes in the Defendant's intellectual functioning since his last psychological evaluation.

On cross-examination, Dr. Munson testified that he had performed outpatient evaluations to determine competency and sanity in the past. Dr. Munson stated that if he believed he could not make a judgment as to competency or sanity based solely on the outpatient evaluation, he would refer the subject for an inpatient evaluation. After hearing Dr. Munson's testimony, the trial court denied the Defendant's motion for an additional, inpatient evaluation.

On appeal, the Defendant first contends that the trial court erred in denying his motion for an inpatient evaluation because the results of his outpatient evaluation indicated that an inpatient evaluation was needed to ensure that he was competent to stand trial. The Defendant argues that Dr. Munson's report

-11-

and testimony revealed that the outpatient evaluation was not sufficient to make a proper determination of his competency. In particular, the Defendant focuses on Dr. Munson's conclusion that "while Mr. Dearry appears to be legally competent, his competence is minimal."

The primary statutory provision governing competency evaluations is Tennessee Code Annotated section 33-7-301. That section reads, in pertinent part, as follows:

> When a person charged with a criminal offense is believed to be incompetent to stand trial, or there is a question as to the person's mental capacity at the time of the commission of the crime, the criminal, circuit, or general sessions court judges may . . . order the defendant to be evaluated on an outpatient basis . . . . If in the opinion of those performing the mental health evaluation, further evaluation and treatment is needed, the court may order the defendant hospitalized, and if in a state hospital or state-supported hospital, in the custody of the commissioner for not more than thirty (30) days for the purpose of further evaluation and treatment as it relates to competency to stand trial subject to the availability of suitable accommodations.

Tenn. Code Ann. § 33-7-301(a) (Supp. 1997). The plain language of subsection (a) vests the trial court with discretion in granting a motion for psychological evaluation as well as in ordering an inpatient evaluation should those individuals performing the outpatient evaluation recommend further testing. State v. Rhoden, 739 S.W.2d 6, 16 (Tenn. Crim. App. 1987); State v. Johnson, 673 S.W.2d 877, 880 (Tenn. Crim. App. 1984). On appeal, this Court will not disturb the ruling of the trial court absent a showing that the trial court abused that discretion. See State v. Lane, 689 S.W.2d 202, 204 (Tenn. Crim. App. 1984).

After reviewing the record, we do not believe that the trial judge abused his discretion by denying the Defendant's motion for an inpatient evaluation.

Although Dr. Munson stated that the outpatient evaluation of the Defendant presented a "close call," he did find the Defendant to be competent to stand trial. Moreover, the additional tests mentioned by Dr. Munson were performed on the Defendant during the summers of both 1992 and 1993. The records reviewed by Dr. Munson as part of the outpatient evaluation reveal that the Defendant underwent psychological testing in July of 1992 to determine his intellectual ability and emotional functioning with respect to his capacity to parent. That evaluation included a clinical interview, the Wechsler Adult Intelligence Scale - Revised test, and the Rorschach Ink Blot test. In addition, the Defendant underwent psychological testing in July of 1993 to determine his qualification for disability benefits. That evaluation included a clinical interview, the Wechsler Adult Intelligence Scale - Revised test, the Wide Range Achievement test, the Bender Visual Motor Gestalt test, the Rorschach Psychodiagnostic test, and the Minnesota Multiphasic Personality Inventory - Critical Item List test. Both evaluations indicated that the Defendant was mildly mentally retarded. Dr. Munson took these evaluations into account when making his determination of the Defendant's competency after the outpatient evaluation. From this record, we cannot conclude that the trial judge erred in denying the Defendant's motion for an inpatient evaluation to determine his competency to stand trial.

The Defendant next contends that the trial court erred in denying his motion for an inpatient evaluation because the results of the outpatient evaluation did not sufficiently answer the question of whether his mental illness rendered him substantially incapable of conforming his conduct to the requirements of the law. The Defendant alleges that Dr. Munson, in finding that an insanity defense could not be supported, concluded only that the Defendant's mental illness did

not prevent his knowing the wrongfulness of his conduct. The Defendant focuses on the following language from Dr. Munson's report to the trial court:

> After completion of the evaluation based on the standard adopted by the Tennessee Supreme Court in Graham vs. State in 1977, and on the criteria set forth in T.C.A. 39-11-501, it is my opinion that a defense of insanity cannot be supported. This opinion is based on the determination that although the defendant was suffering from a mental illness at the time of the crime, the mental status was not such as to prevent his knowing the wrongfulness of his act.

The Defendant therefore argues that Dr. Munson's conclusions from the outpatient evaluation are inadequate with respect to the issue of sanity.

In Graham v. State, 547 S.W.2d 531 (Tenn. 1977), our supreme court stated that a "person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." Graham, 547 S.W.2d at 543. As the Defendant points out, Dr. Munson's outpatient evaluation revealed that the Defendant was suffering from the mental illness of mental retardation. The Defendant argues that while Dr. Munson was able to conclude that his mental retardation did not render him substantially incapable of appreciating the wrongfulness of his conduct, the outpatient evaluation did not answer the question of whether his mental retardation rendered him substantially incapable of conforming his conduct to the requirements of the law. Accordingly, the Defendant contends that the outpatient evaluation was deficient with regard to the issue of sanity and the trial court erred in denying an additional, inpatient evaluation to cure the deficiency.

After a careful review, we believe the outpatient evaluation adequately addressed the issue of the Defendant's mental condition at the time of the offense in compliance with the requirements of <u>Graham</u>. From the outpatient evaluation, Dr. Munson concluded that the Defendant was indeed suffering from a mental illness at the time of the alleged offense, namely mental retardation. Dr. Munson went on to conclude, however, that an insanity defense could not be supported in the Defendant's case. In so finding, Dr. Munson specifically referenced the standard set forth in <u>Graham</u> and Tennessee Code Annotated section 39-11-501, basing his conclusion on their requirements. Furthermore, at the hearing on the Defendant's motion for an inpatient evaluation, Dr. Munson testified that in his professional opinion, the Defendant's mental retardation did not "come into play at all" at the time of the alleged offense. While the language of Dr. Munson's report specifically mentions only the Defendant's ability to appreciate the wrongfulness of his conduct, we do not believe that this general explanation for Dr. Munson's conclusion that an insanity defense could not be supported indicates that the outpatient evaluation did not comply with the requirements of <u>Graham</u>. This is highlighted by Dr. Munson's testimony that the Defendant's mental retardation did not "come into play at all" at the time of the offense. Accordingly, we conclude that the trial court did not err in denying the Defendant's motion for an inpatient evaluation. The Defendant's second issue lacks merit.

In his third issue on appeal, the Defendant argues that the trial court erred in admitting his statement to Detective McCoig. He contends that the totality of the circumstances indicates that his Miranda waiver and subsequent statement

to McCoig were not voluntary.[4] In particular, the Defendant points to his mental retardation, low IQ, lack of education, illiteracy, and limited intellectual functioning. He argues that these circumstances render his statement involuntary.

It is well-established that, in order to be valid, a waiver must be made "voluntarily, knowingly, and intelligently." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1601, 16 L.Ed.2d 694 (1966). In determining the voluntariness of a defendant's statement, courts must consider the totality of the circumstances surrounding the statement. State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980); State v. Benton, 759 S.W.2d 427, 431-32 (Tenn. Crim. App. 1988). On appeal, this Court will not disturb the trial court's determination as to voluntariness unless the evidence in the record preponderates against that determination. Kelly, 603 S.W.2d at 729.

In the case sub judice, the Defendant filed a pretrial motion to suppress his statement and the trial court conducted a hearing on October 30, 1995. At that hearing, Detective McCoig testified that on February 3, 1995, after the victim's report of sexual abuse, he interviewed the Defendant at the DHS office in Dandridge, Tennessee. McCoig read the Defendant his Miranda rights because the Defendant indicated that he could not read the Miranda waiver form. The Defendant then signed the waiver form and agreed to speak with him about the allegations of sexual abuse. Penny Inman, a DHS counselor, witnessed the waiver. The Defendant made a statement, which McCoig reduced to writing and

---

[4] The State does not contest that the Defendant was "in custody" for purposes of his interview with Detective McCoig, but rather focuses solely on the validity of the Defendant's Miranda waiver. As a result, we will assume that the Defendant was "in custody" in addressing this issue.

read back to the Defendant, giving the Defendant an opportunity to make changes. The Defendant then signed the statement. McCoig testified that the Defendant appeared to understand both his Miranda rights and his waiver of those rights. On cross-examination, McCoig admitted that he was unaware that the Defendant was mentally retarded.

Penny Inman, a DHS counselor, testified that she witnessed the Defendant's Miranda waiver. She confirmed that the Defendant appeared to understand Detective McCoig as he explained the Miranda rights and the waiver form.

The Defendant testified that he went to school through only the fourth grade. He attended special education classes, but is currently unable to read or to write. He stated that he recalled Detective McCoig talking to him about his rights but did not understand McCoig. In particular, he did not fully understand his right to counsel. On cross-examination, the Defendant admitted that McCoig had told him that the court would appoint an attorney for him if he needed one. The Defendant testified, however, that he believed he could not consult an attorney at the time he gave the statement because there was not one available.

It was undisputed that, according to psychological evaluations performed in 1992 and 1993, the Defendant was mildly mentally retarded. In July of 1992, he was found to have a full-scale IQ of 58. In July of 1993, he was found to have a full-scale IQ of 66. After hearing all of the evidence, the trial court denied the Defendant's motion to suppress his statement.

From our review of the record, we cannot conclude that the evidence preponderates against the trial court's determination that the Defendant's statement was voluntary. The trial court was in a better position to evaluate the credibility of McCoig, Inman, and the Defendant. McCoig and Inman testified that the Defendant appeared to understand his Miranda rights and the waiver, while the Defendant testified to the contrary. The trial judge resolved the conflicts in the testimony against the Defendant. We cannot conclude that the evidence preponderates against this finding. Moreover, the Defendant's mild mental retardation, low IQ, minimal education, and illiteracy do not, in and of themselves, render the Defendant's statement involuntary. See State v. Greer, 749 S.W.2d 484, 485 (Tenn. Crim. App. 1988); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984). Rather, they constitute factors for the trial court to consider in evaluating the totality of the circumstances. In the present case, the psychological evidence pertaining to the Defendant's limited intellectual functioning did not demonstrate that the Defendant was wholly incapable of understanding and waiving his rights. Instead, the trial judge found from his observation of the testimony at the suppression hearing that the Defendant's statement was voluntary, in spite of evidence of mild mental retardation. From this record, we cannot conclude that the trial court erred in denying the Defendant's motion to suppress his statement to Detective McCoig. See State v. Howse, 634 S.W.2d 652, 654-55 (Tenn. Crim. App. 1982). The Defendant's third issue is without merit.

In his fourth issue on appeal, the Defendant argues that the trial court erred in permitting the State to pose leading questions to the victim at trial. The victim was ten years old at the time of the Defendant's trial. On direct examination, the

prosecutor often posed general, non-leading questions to the victim and, not surprisingly, received somewhat vague answers from the child victim. As a result, the prosecutor occasionally sought to direct the victim's attention and answers to relevant details. The Defendant sometimes objected to these leading questions, and the trial court sustained a number of the Defendant's objections.

The principal complaint on appeal, however, centers upon an entire line of questioning. On direct examination of the victim, the prosecutor initially asked the very general question of whether the Defendant had done "something bad" to her. The victim responded that the Defendant had touched her "private part" with his hands and had her touch his "private part." The following colloquy then took place:

Q. What did he ask you to do?
A. Take off my clothes.
Q. Alright. Did you do that?
A. Yes.
Q. What else did he ask you to do?
A. I can't remember.
Q. Did you ever touch him with your mouth?
A. Yes.

At this point, the Defendant objected to the leading nature of the question. The trial court sustained the objection, and a bench conference was held at which the prosecutor proposed to the trial court the line of questioning he wished to pursue. The Defendant maintained his objection to the prosecutor's questions. After the prosecutor had narrowed the time frame to "after Christmas, after school started and before you told anybody, before you told Penny Inman [the DHS counselor]," the trial court permitted the following line of questioning:

Q. T[.R.], did you touch him with your mouth somewhere?
A. Yes.
Q. Where did you touch him? Tell the Jury about that, will you?
THE COURT: Just tell them what happened.

A. Well, he tried, he tricked me, he said that he was going to take a nap when Mama was gone to Georgia and he took me into the bedroom and he was showing me these dirty books and stuff. He told me to do what they were doing.

Q. And tell the Jury the rest of it. What was that they were doing?

A. Licking his private part.

Q. Did you do that?

A. Yes.

On appeal, the Defendant argues that the trial court erred in permitting this line of questioning. He contends the questions were impermissibly leading in that the victim had not mentioned any instances of oral penetration when answering the prosecutor's initial general question about what had occurred between her and the Defendant.

Of course, rulings on the admissibility of evidence and the propriety and form of the examination of witnesses are entrusted to the sound discretion of the trial court. See, e.g., State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994), cert. denied, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Such rulings will not be reversed on appeal absent an abuse of that discretion. See State v. Caughron, 855 S.W.2d 526, 541 (Tenn. 1993), cert. denied, 510 U.S. 579, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993). Furthermore, trial courts have been given broad discretion in permitting leading questions in sexual abuse cases when the witness is a child victim. Swafford v. State, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975).

In the case at bar, we conclude that the trial judge did not abuse his discretion in allowing the prosecutor to direct the child victim's testimony to the incident involving oral penetration. As the passages quoted above demonstrate,

although some of the questions posed to the victim were leading, none of the questions were unduly suggestive of a desired response. From this record, we simply cannot conclude that the trial court erred in permitting the State's questions to the child victim. The fourth issue is without merit.

In his fifth issue on appeal, the Defendant argues that the trial court erred by failing to require the State to elect the proof relied upon to sustain the conviction. The Defendant contends that the State presented proof of multiple acts of sexual abuse committed by the Defendant against the victim. The indictment charged the Defendant with one count of rape of a child occurring in January of 1995, but did not specify any further details of the offense. The Defendant complains that these circumstances posed the danger that the jury might have reached a "patchwork" verdict, with some jurors convicting him based on one incident while other jurors convicted based on a different incident. Thus, the Defendant challenges the State's failure to elect the particular offense for which it sought a conviction and argues that the trial court erred by failing to require the State to elect.

We agree with the Defendant that our supreme court's holding in Burlison v. State, 501 S.W.2d 801 (Tenn. 1973), requires the State to identify the specific offenses for which it seeks convictions. Burlison, 501 S.W.2d at 804. Moreover, it is the duty of the trial court to require election, regardless of a request from the defendant. Id. Our supreme court explained the reasoning behind the rule as follows:

> First, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue, and third, so that the jury's verdict

-21-

may not be a matter of choice between offenses, some jurors convicting on one offense and others, another.

Id. at 803. Of these three rationales, the third addresses the most serious concern, namely the constitutional right to a unanimous jury verdict before a criminal conviction is imposed. State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993).

In the case sub judice, we believe that the State did, in effect, elect the proof upon which it sought conviction even though the trial court did not explicitly require an election. As the Defendant suggests, the proof at trial did relate to multiple instances of sexual abuse. In response to the State's initial open-ended questioning, the victim testified on direct examination in general terms that the Defendant touched her "private part" with his hands and had her touch his "private part." The State did not, however, attempt to elicit further details to narrow the time frame in which these acts occurred. Instead, the prosecutor directed the victim's attention to any acts which had occurred after school began following the 1994-1995 Christmas break but before the victim spoke with DHS counselor Penny Inman about the abuse. This period corresponded roughly with the period set forth in the indictment, January of 1995. The victim then related the incident in which the Defendant showed her "dirty books" and told her to do what was portrayed in them, namely "[l]icking his private part."

On cross-examination, the victim admitted that she had told an examining doctor that the Defendant had penetrated her vagina with both his fingers and his penis. On redirect examination, however, the State sought clarification of this testimony. The victim then testified that the Defendant had attempted to put his

fingers and penis in her vagina, but she had "pretty much" stopped him from doing so.

The remainder of the State's proof concerning the elements of the offense came from Detective Bud McCoig. McCoig testified that he took a statement from the Defendant on February 3, 1995. McCoig then read a redacted version of the statement into evidence. In the statement, the Defendant related an incident in which he "rubbed [his] penis on her vagina" and an incident in which the victim "licked" his penis, putting "her mouth over the side of [his] penis." The time frame given by the Defendant for these incidents was "about a month ago."

As part of his proof, the Defendant offered the expert medical testimony of Dr. John Ellis. Dr. Ellis testified that he performed a physical examination of the victim in response to allegations of sexual abuse. Dr. Ellis's examination revealed that the victim's hymen was intact and that there was no physical evidence of penetration of the victim's vagina. The State did not challenge this testimony, but instead chose to question Dr. Ellis about whether his examination could have revealed evidence of oral penetration or mere touching of the exterior of the victim's vagina. Dr. Ellis stated that his examination could not reveal such evidence but rather was limited to evidence of vaginal penetration.

At the close of proof, the Defendant did not request that the State elect the proof relied upon to sustain the conviction, nor did the trial court sua sponte require the State to elect. Yet the transcript of the prosecutor's closing argument reveals that the State did, in effect, elect to proceed upon the proof of oral

penetration.  In his initial closing argument, the prosecutor summarized the proof as follows:

> The proof has shown you that the Department of Human Services got some information that this child had, somebody had done something to this child and they went to talk to her and she told them like she told you here today that the defendant had been doing some bad things to her.  And in the words of a little child you heard testimony that he touched her private parts there in the home when her mama wasn't there and nobody was around.  He had her touch his private parts with her mouth and lick his private parts with her mouth.  And that happened in the home when nobody was around as she told.

The prosecutor went on to argue that the Defendant's own statement confirmed the testimony of the victim.  In particular, the prosecutor pointed out that "[i]n his own words he [the Defendant] told you what he did and how he would pull back and how he had her put her mouth over the side of his penis and lick him and he touched her."

The Defendant's closing argument focused on the prior inconsistent statement given by the victim.  Defense counsel pointed out that the victim had initially told her examining doctor that the Defendant had vaginally penetrated her with both his fingers and his penis.  Defense counsel then proceeded to emphasize that the expert medical proof indicated that the victim's hymen was intact and that she had not been penetrated vaginally.  Accordingly, defense counsel argued that the jury could not trust the victim's testimony "about the other type of penetration . . . what the Judge I believe will call oral penetration, in her mouth, his penis."

In his rebuttal argument, the prosecutor attempted to respond to the Defendant's closing argument by emphasizing that the victim was nine years old

at the time of the offense and did not understand the technical significance of penetration. The prosecutor contended that because of her youth, the victim might term even a mere touch on the exterior of her vagina a "penetration." In concluding his argument that the jury should disregard the victim's prior inconsistent statement, the prosecutor stated that "[m]aybe he didn't penetrate her, not in the vagina. But she told you she had to lick his penis or his private part. He did penetrate her there and he's committed Rape of a Child."

Of even greater significance are the prosecutor's final remarks to the jury.

> I submit to you the truth is what the little girl said, that it happened, what Bud McCoig heard, what Penny Inman heard and what came out of the defendant's own mouth when he was at the Department of Human Services. And that was that she put her mouth over the side of his penis just like he said in his statement. And those things happened right here in Jefferson County and he's guilty of raping that little girl.

The jury was instructed on the indicted offense of rape of a child and the lesser included offense of aggravated sexual battery. After deliberating, the jury found the Defendant guilty of rape of a child as charged in the indictment.

From our reading of the record, we believe that the prosecutor's closing argument effectively served as an election of the proof upon which the State wished to proceed. The proof presented by the State at trial related to multiple instances of sexual abuse, apparently including touching of the victim's vagina and an incident in which the victim "licked" the Defendant's penis. It is clear from the prosecutor's attempts to direct the victim's attention to the latter incident, however, that the State was primarily interested in eliciting proof of the alleged oral penetration. Furthermore, the prosecutor's closing argument focused the jury's attention on the alleged incident of oral penetration as the act constituting

-25-

the criminal offense of rape of a child. In fact, the prosecutor all but admitted that there was insufficient evidence of vaginal penetration. We believe that these circumstances obviated the danger of a "patchwork" verdict, the principal concern of the doctrine of election. Accordingly, we conclude that the prosecutor did in fact effectively elect the proof upon which the State wished to proceed, that of oral penetration, during his closing argument to the jury.

Moreover, even if we were to conclude that the State had failed to elect, we believe the error to have been harmless beyond a reasonable doubt under the circumstances of the case sub judice. The victim testified only in general terms that the Defendant had touched her vagina. More significantly, however, she testified in greater detail to one incident, occurring between the 1994-1995 Christmas school break and her February 3, 1995, interview with DHS counselor Penny Inman, in which she "licked" the Defendant's penis. The prosecutor emphasized this incident during both the presentation of proof and closing argument. Because the jury returned a verdict of rape of a child rather than aggravated sexual battery, we conclude that the jury must have considered the evidence of the incident involving oral penetration in convicting the Defendant.[5] See State v. Shelton, 851 S.W.2d 134, 138-39 (Tenn. 1993). The Defendant's fifth issue therefore provides no basis for reversal of his conviction.

For the reasons set forth in the discussion above, we conclude that the Defendant's issues on appeal lack merit. We therefore affirm the judgment of the trial court.

---

[5] As we stated above, the jury was instructed on both rape of a child and aggravated sexual battery. Of course, rape of a child requires proof of sexual penetration whereas aggravated sexual battery requires proof of sexual contact. See Tenn. Code Ann. §§ 39-13-522, 39-13-504.

_____
DAVID H. WELLES, JUDGE


CONCUR:



_____
GARY R. WADE, JUDGE



_____
JERRY L. SMITH, JUDGE