**STATE of Tennessee, Appellee,**

v.

**Richard PERKINSON and Lila Peeler.**

Court of Criminal Appeals of Tennessee,
at Knoxville.

Sept. 24, 1992.

Petition to Appeal Denied
Feb. 1, 1993.

James F. Logan, Cleveland, for Perkinson.

Donald B. Reid, Athens, for Peeler.

Charles W. Burson, Atty. General and Reporter, John B. Nisbit, III, Asst. Atty. Gen., Nashville, Jerry N. Estes, Dist. Atty. Gen., Athens, for State of Tennessee.

## OPINION

WADE, Judge.

The defendant, Richard Perkinson, was convicted of both solicitation to commit first degree murder and conspiracy to commit first degree murder. His sentences were 11 and 21 years, respectively. The defendant, Lila Peeler, was convicted of conspiracy to commit first degree murder and sentenced to 21 years.

In their separate appeals, both Perkinson and Peeler assert that the indictment is insufficient as a matter of law because it failed to allege an overt act. Perkinson contends that the trial court erred by (1) prohibiting impeachment of a witness with collateral evidence and (2) refusing to instruct the jury on accomplice testimony. Peeler contends that the trial court erred by (1) denying her motion for severance and (2) refusing to direct a judgment of acquittal based upon insufficient evidence.

The state presents a separate appeal contending that the trial court erred by its refusal to impose consecutive sentences.

We affirm Perkinson's conviction for solicitation to commit first degree murder. Because the indictment failed to allege an essential element of the offense, the convictions for conspiracy as to each defendant are reversed and dismissed. The state appeal has been rendered moot by our reversal of Perkinson's conspiracy conviction.

At the conclusion of a five-day trial which had commenced February 4, 1991, the defendants were acquitted of first degree murder charges. Convictions were, however, returned against the defendant Perkinson on charges of solicitation to commit the murder of Gilbert Peeler and conspiracy to commit the murder; the defendant Peeler, widow of the victim, was convicted of conspiracy to commit the murder.

The victim worked as a mechanic and wrecker driver for Roberts Brothers Motors,

a heavy duty truck repair service in Athens. On the morning of November 2, 1989, an employee who reported to work around 7:15 A.M. found that the defendant had been shot to death. The engine to the victim's wrecker was still running and the driver's door was open.

Upon investigation, officers learned that at about 4:40 A.M., John Landreth had seen a vehicle being driven across a field to the victim's place of business. The car left about thirty minutes later. Photographs were taken of the car tracks left in the field. The victim's wallet was found in a grassy area near the crime scene. The TBI found 14 prints on the wrecker, none of which matched those of the defendant Perkinson.

The defendant Peeler, who acknowledged to officers that she and the victim had experienced marital problems, told officers that the victim came in at approximately 4:30 A.M. on the morning of his death. She related that he received a phone call and said, "Yeah, I'll be there in a minute." He then left. Investigators later found that no requests for wrecker service had been reported to the Tennessee Highway Patrol between 4:30 and 6:00 A.M. on the day of the murder.

Joe Roberts, Jr., an owner of the business, testified that the victim generally called him when he received a call from someone he did not know. On previous occasions, the victim had telephoned the owner a number of times during the middle of the night. He did not, however, telephone about the service request just prior to his death.

When interviewed prior to the trial, the defendant Perkinson admitted that he and the defendant Peeler had been seeing each other for four to six months. He denied owning a .22 revolver, the weapon used in the victim's murder. Upon inspecting Perkinson's automobile, officers found nothing that indicated that the car had been driven through tall grass. They were unable to match the tires of Perkinson's vehicle with photographs and soil samples taken from tracks left at the scene. Perkinson, however, had bought new tires on the day of the murder.

In the spring of 1989, Perkinson admitted to a friend and co-worker, Claude Garren, that he was having an affair with the defendant Peeler. He told Garren that he wanted to have the victim killed and had talked to both Gary Thompson and Danny Kellar about performing the act. When Garren asked why the Peelers did not divorce, Perkinson said the victim "would never leave them alone." Telephone tapes established that Perkinson and Lila Peeler continued their relationship after the victim's death.

Danny Kellar, with prior convictions for involuntary manslaughter and drug offenses, stated that he had known Perkinson for years and had bought drugs from him to resell. Kellar, testifying under a promise not to prosecute, confirmed that Perkinson had approached him about killing someone. Although Perkinson, who was owed money by Kellar, did not identify the victim, he made reference to getting in "a mess with somebody's husband." Kellar refused to participate. A few weeks passed before Perkinson asked Kellar to get Steve Casson to do the killing for $2,000. Although Perkinson persisted in his requests for assistance, Kellar either would not, or was unable to, find a killer. About two or three weeks after his last contact with Perkinson, Kellar learned of the victim's death.

Some three months after the murder, Kellar agreed to be wired with a transmitter by the TBI and went to the Perkinson residence. When Kellar arrived at Perkinson's home, however, he mistakenly turned off the switch. In the conversation that followed, none of which was recorded, Perkinson said he was "air tight" and that Kellar should keep his "mouth shut and there wouldn't be any problems."

Casson, who had some 73 prior arrests by the time of this trial, testified that Perkinson had asked him "to take care of" the victim ... and offered to kill Casson's girlfriend's husband in return. Casson testified that he refused the offer.

Although the authorities had not yet released news of the murder when Garren saw Perkinson at about 8:15 A.M. on November 2, Perkinson told him that someone had just called and instructed him to get his "money

ready." When Garren asked about the defendant Peeler, Perkinson responded, "She's either at work or at the morgue." As Perkinson left, he said, "If anybody asks, you don't know where I'm at." Later in the day, Garren heard a news report of the victim's death.

Some two months later, before the defendants were arrested, Perkinson told Garren that he would get one-half of a double indemnity life insurance policy with $200,000 from Lila Peeler. Perkinson had debts of about $120,000 at the time. After his arrest, Perkinson asked Garren if he had told police about either Gary Thompson or his purchase of a .22 caliber revolver from Carl Darnell.

Summer Peeler, daughter of the victim, testified that she did not hear the telephone ring on the morning of her father's death. Although she recalled that the victim had come home on the morning of his death, she did not know that he had left. Her brother, Travis Peeler, had overheard an argument between the Peelers about money. Although he slept near the phone, he did not hear it ring on the morning of the murder.

Various insurance policies on the victim's life totalling $22,577.00 named Lila Peeler as the beneficiary. A policy purchased in June of 1988 had a death benefit in the sum of $100,000; the defendant Peeler was the beneficiary. The owner of Roberts Motors and a bookkeeper familiar with the victim's handwriting stated that the signature on this policy was not that of the victim. The insurance agent recalled that he had dealt primarily with Lila Peeler and that she had brought the policy into his office, already bearing the victim's purported signature. A former employer of the defendant Peeler stated that the signature of the victim appeared to be in Lila Peeler's handwriting.

The medical examiner determined that multiple gunshot wounds and internal and external bleeding had caused the victim's death. A firearms expert examined four bullets taken from the victim and one found at the scene. They were .22 caliber and could be fired from either a .22 caliber revolver or a .22 caliber rifle. From appearances, each of the bullets had been fired from the same gun. Powder burns indicated that three of the shots had been fired from a distance of three feet or less. A .22 revolver was never found.

In extensive testimony, both Perkinson and Lila Peeler denied any involvement in the commission of the crimes. Tim White claimed to have purchased a .22 pistol from Perkinson in September of 1989, a month and a half before the murder. Jerry Stevens had spoken to Perkinson at about 6:20 A.M. on the day of the crime. He noticed nothing unusual in Perkinson's voice. Neighbors testified that Perkinson had not, at least to their knowledge, left his residence on the morning of the crime.

I

Each of the defendants asserts the conspiracy count was legally insufficient on the basis that there was no allegation of "an overt act." The state contends that the issue has been waived.

The crime of conspiracy is statutorily defined as follows:

(a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

\*　　\*　　\*　　\*　　\*　　\*

(d) No person may be convicted of conspiracy to commit an offense unless *an overt act in pursuance of such conspiracy is alleged and proved* to have been done by the person or by another with whom the person conspired.

Tenn.Code Ann. § 39–12–103(a) & (d) (emphasis added).

At common law, a conspiracy did not require proof of an overt act. The Sentencing Commission Comments note that the subsection requiring an overt act altered prior Tennessee law:

This requirement assures that the conspiracy is more dangerous than a mere agreement. It also protects against erroneous

convictions based solely on the exchange of words.

In order to commit the offense of conspiracy, the state must prove that (1) each conspirator had the culpable mental state to commit the offense; (2) each conspirator must act for the purpose of promoting or facilitating the offense; and (3) at least one of the conspirators must commit an overt act in furtherance of the agreement.

Our court recently confirmed that an overt act in furtherance of the conspiracy was an element of the crime. In that case, the omission was fatal to the indictment. *State v. William A. "Buddy" Reese,* 1991 WL 202411 (Tenn.Crim.App., Nashville, October 11, 1991). In *State v. Mencer,* 798 S.W.2d 543 (Tenn.Crim.App.1990), this court held that the requirement that an indictment allege all essential elements of the offense would apply to the crime of conspiracy. The allegation of an overt act was deemed necessary under the following rationale:

> To allow a prosecutor or court to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection that the grand jury was designed to secure, because a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him.

*United States v. Cecil,* 608 F.2d 1294, 1297 (9th Cir.1979) (*quoting United States v. Keith,* 605 F.2d 462, 464 (9th Cir.1979)).

The provisions of both the Federal and Tennessee Constitutions guarantee the criminally accused knowledge of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to comply with these constitutional guidelines, an indictment or presentment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. *State v. Pearce,* 7 Tenn. 65, 67 (1823); *State v. Byrd,* 820 S.W.2d 739 (Tenn.1991). When the indictment or presentment fails to fully state the crime, all subsequent proceedings are void.

*State v. Morgan,* 598 S.W.2d 796, 797 (Tenn. Crim.App.1979).

The conspiracy count of the indictment against the defendants provides, in pertinent part, as follows:

> ... Rick Perkinson and Lila Peeler ... on or about the 2nd day of November, 1989, ... *did* unlawfully, knowingly, and feloniously *conspire with each other* to commit first degree murder through the actions of another whom *they agreed to* feloniously move, incite, counsel, hire, command or procure to willfully, deliberately, maliciously, and with premeditation kill Gilbert Peeler, in violation of the statute and against the peace and dignity of the state of Tennessee.

(Emphasis added.)

This indictment alleged the required mental state for the conspiracy. The requisite notice of facilitation or procurement was present and, while there was proof that one or both of the defendants committed acts in furtherance of the agreement, the indictment failed *to allege* that either of the defendants committed "an overt act in pursuance of [the] conspiracy," as required by the statute. "Conviction upon a charge not made would be sheer denial of due process." *De Jonge v. State of Oregon,* 299 U.S. 353, 362, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937). A lawful accusation is an essential jurisdictional element without which there can be no prosecution. *State v. Hughes,* 212 Tenn. 644, 371 S.W.2d 445 (1963).

The state correctly points out that Rule 12(b) of the Tennessee Rules of Criminal Procedure provides that any defenses based upon defects in the indictment must be raised prior to trial. The defendant concedes that the motion was not presented before the trial began but submits that this court should nonetheless consider the issue.

Tenn.R.Crim.P. 12(b)(2), however, provides that either jurisdictional defects or the failure to properly charge an offense "shall be noticed by the court at any time during the pendency of the proceedings." If the indictment does not charge an offense, Tenn. R.Crim.P. 34 permits an arrest of the judgment if "filed within thirty days of the date

[of] the order of sentence...." Moreover, our rules require that we determine "whether the trial and appellate court have jurisdiction over the subject matter," even though the issue might not have been presented as a ground for relief. Tenn.R.App.P. 13(b). The issue has not, therefore, been waived.

In summary, the waiver rule does not apply when the indictment fails to assert an essential element of the offense. In that circumstance, no offense has been charged. In consequence, subsequent proceedings are a nullity. Thus, both convictions for conspiracy to commit first degree murder must be reversed and dismissed.

As to the defendant Peeler, our resolution of the first issue pretermits consideration of her remaining issues. Further, the state appeal on the issue of consecutive sentencing has been rendered moot by our dismissal of Perkinson's conspiracy conviction.

## II

Perkinson also contends that the trial court erred by (1) prohibiting impeachment of a witness with collateral evidence, and (2) refusing to instruct the jury on accomplice testimony. We disagree with the first assertion. As to the second, we find the error was harmless beyond a reasonable doubt.

Danny Kellar testified that he had, on behalf of the defendant Perkinson, asked Steve Casson to kill the victim. Casson gave a physical description of the person on whose behalf Kellar made the request. Casson had initially described to the police the person on whose behalf Kellar made the request as wearing a blue work shirt bearing the name of an air-conditioning company and embroidered with the name which "possibly" began with a "J." At trial, Casson recalled that the first name was Rick. In the course of the investigation, Casson, one of the first to cooperate with the police, went to Kellar wearing a wire in order to find out the last name. Afterwards, Casson was able to identify a photograph of the defendant Perkinson. Casson also identified Perkinson at trial as the individual who had been introduced by Kellar and who had attempted to arrange the killing. Casson's description to police was that the individual had long, sandy blond hair, was less than six feet tall, and weighed between 150 and 170 pounds.

The defendant Perkinson contends that the description Casson gave police fit Joe Roberts, Jr., a witness for the state. Roberts had found the victim's billfold near the crime scene after law enforcement officers had thoroughly, but unsuccessfully, searched the area. During cross-examination, Roberts had been asked about possible cocaine dealings with the victim. Roberts denied the charge. When defense counsel for Perkinson sought to introduce, through the defendant Peeler, evidence of cocaine dealings between Roberts and the victim at or near the time of the killing, the court excluded the testimony.

The apparent purpose of the evidence was to either discredit the witness or to establish that someone other than Perkinson might have had a motive to kill the victim. The defendant Perkinson specifically sought to question Lila Peeler about whether Roberts had supplied the victim with drugs sometime during 1989. This followed Perkinson's cross-examination of Roberts wherein Roberts denied that the Peelers had acquired cocaine or any other illegal drugs from him.

Rule 607 of the Tennessee Rules of Evidence provides that the credibility of a witness may be attacked by any party. The rule did not, however, abolish the collateral evidence rule:

> [This] rule ... severely limits counsel's ability to introduce extrinsic proof of the contradictory facts. According to this rule, there can be no extrinsic proof of collateral matters. If the fact being contradicted is deemed collateral (its only relevance is that it contradicts something said in court), counsel must use cross-examination of the witness being impeached to bring out the contradictory fact and must accept the witness' response, even if it is a denial that counsel could disprove. Counsel cannot prove the fact by such extrinsic proof as the testimony of other witnesses. The collateral attack rule is designed to save time and confusion over the real issues.

N. Cohen, D. Paine & S. Sheppeard, *Tennessee Law of Evidence,* § 607.3 (2d ed. 1990).

■ We think the trial court properly excluded the testimony under the collateral evidence rule. Perkinson attempted to elicit the testimony in order to contradict Roberts' denial of the transaction; the excluded testimony did not, in and of itself, tend to show that Roberts planned and committed the murder. A possible exchange of drugs between Roberts and the Peelers sometime in 1989 does not meet the applicable standard: that is, is its relevance to the issues substantially independent of its contradiction with earlier testimony? *See Franklin v. Franklin*, 90 Tenn. 44, 16 S.W. 557 (1891). The proffered evidence would not have been admissible, in our view, in that it did not "tend to prove a material issue," simply a collateral one. Advisory Commission Comments, Tenn.R.Evid. 401. The record does not establish a viable third party defense. Absent that, the excluded testimony would have only served to confuse the jury and to cause unwarranted speculation on an apparently unrelated, and otherwise unsubstantiated, event.

The defendant Perkinson also argues that the state's witness, Danny Kellar, should have been declared an accomplice as a matter of law and that the trial court erred by its failure to so instruct the jury. Although not entirely clear from the record, it appears that this argument relates primarily to the conviction for conspiracy, rather than that for solicitation. We will nonetheless discuss the guiding principles.

■ The general rule is that one cannot be convicted on the uncorroborated testimony of an accomplice. *Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811 (1959). Slight circumstances, however, are enough to meet the required degree of corroboration. *McKinney v. State*, 552 S.W.2d 787 (Tenn.Crim. App.1977).

■ An accomplice is defined as a person who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime. *Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34 (1964). An accomplice may be so declared by the trial court as a matter of law or the issue may be submitted to the jury.

■ When the facts are clear and undisputed concerning a witness' participation in the crime, whether he is an accomplice is a question of law for the court to decide. When the facts are in dispute or susceptible to different inferences, it becomes a question of fact for the jury. *Conner v. State*, 531 S.W.2d 119, 123 (Tenn.Crim.App.1975). Ultimately, it is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated. *Pennington v. State*, 478 S.W.2d 892 (Tenn.Crim.App. 1971).

■ Kellar, under this record, was not an accomplice as a matter of law as to any of the offenses charged. In that respect, we agree with the trial court. A common test is whether the alleged accomplice could have been indicted for the offense. That is doubtful. There are facts in evidence, however, as to the limited participation of Danny Kellar in the conspiracy. Some evidence suggested he cooperated to a limited degree with Perkinson's effort to hire a killer. Kellar had a prior homicide conviction. He owed Perkinson money. There was more than one discussion between the two on the subject of finding someone to kill the victim. Kellar talked to Casson about the prospect. Although described as a "loose wire" who knew "too much," Kellar did not report the matter to authorities. Initially, he was a subject of the police investigation. Whether he combined with the principal offenders to knowingly commit the crime is neither clear nor indisputable. Yet, in the light most favorable to the defendant Perkinson, there are circumstances from which a jury could infer that Kellar was at least peripherally involved in a conspiracy to cause the death of the victim. Whether a witness is an accomplice as a matter of fact is a jury issue. If the latter, the appropriate charge is as follows:

In this case, it is a question for the jury to determine whether the witness, *Danny Kellar*, was an accomplice in this alleged crime. If you find from the proof that the witness was an accomplice, then the defendant cannot be convicted upon the uncorroborated testimony of the witness. If you find that the witness was not an accomplice, then you will judge the weight to be

given to his testimony just as you do that of the other witnesses in the case.

Tennessee Pattern Instruction—CRIM. 37.-09.

Such an instruction may have been appropriate as to the conspiracy charge. Our reversal of Perkinson's conviction renders the issue moot. The charge should have been made, we think, as to the solicitation charge. The trial court should have defined an accomplice, as provided herein, recited the rule requiring corroborative evidence, then instructed the jury to factually determine whether Danny Kellar met the definition. If so, the jury should have then determined whether other evidence adequately corroborated his testimony.

 We nonetheless think the error was harmless beyond any reasonable doubt. *See State v. Carpenter,* 773 S.W.2d 1, 12 (Tenn. Crim.App.1989). There was ample corroboration. Kellar referred Perkinson to Casson. Casson identified the defendant Perkinson as the person who had asked him to "take care of" the victim. Perkinson told his friend, Garren, of his plans. Garren's testimony was especially damaging. Gary Thompson knew that the defendant was looking for "muscle" just before the killing. Other circumstances, apart from the Kellar testimony, clearly suggested that Perkinson solicited the murder of the victim. In consideration of the whole record, we hold that the failure to instruct the jury on accomplice testimony neither affected the judgment nor prejudiced the process. Tenn.R.App.P. 36(b). Moreover, the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

DWYER and PEAY, JJ., concur.