# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 21, 2012 Session

## STATE OF TENNESSEE v. JIMMY ESTERS

### Appeal from the Circuit Court for Lawrence County
### No. 29198     Stella Hargrove, Judge

### No. M2011-01132-CCA-R3-CD - Filed June 22, 2012

A Lawrence County jury found appellant, Jimmy Esters, guilty of aggravated assault, a Class C felony. The trial court sentenced appellant as a Range I, standard offender, to six years in the Tennessee Department of Correction. On appeal, appellant argues that (1) the evidence was insufficient to sustain his conviction; (2) the prosecutor's comments during closing argument inappropriately shifted the burden of proof to appellant; and (3) the trial court erred in sentencing him. Finding no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Stacie Odeneal, Lawrenceburg, Tennessee, for the appellant, Jimmy Esters.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Mike Bottoms, District Attorney General; and Christi L. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History and Facts

A Lawrence County grand jury indicted appellant for aggravated assault. The trial court held a jury trial on February 22, 2011, at which the parties presented the following evidence.

The victim, Doris Barnett, testified that she was fifty-six years old. The victim had known appellant for approximately twenty-five years. She and appellant had dated for two

years and separated. Five and a half years before the trial, she and appellant began dating again.

The victim spent June 11, 2010, in Loretto, Tennessee, caring for her cousin. She left Loretto between 8:00 and 8:30 p.m. and went to Lawrenceburg to visit appellant. Appellant was a truck driver, and the victim would stay with him when he came home for the weekend. The victim knew appellant was on his way home because he had called her "about [forty-one] times that day and night." She said that when appellant called, he asked her where she was and what was taking her so long to get to his house. The victim did not answer several of appellant's phone calls, which she knew would irritate him. When the victim answered appellant's calls, she "used a few choice words about [appellant's] calling [her] so much." On the way to appellant's house, the victim stopped at Kentucky Fried Chicken to get something for her and appellant to eat. Appellant continued to call her.

Appellant was still calling the victim when she pulled into his driveway. The victim answered the phone and told appellant she was outside his house. Her phone rang again as she entered appellant's house. Appellant left his door open and was smiling when she entered. She went inside and set down her purse and the food she had purchased. When she turned around appellant was "in her face." Appellant said, "'All right.' . . . 'Now f*** you.'" The victim explained that appellant said that because she had said that to him about his phone calls. Appellant also said, "'Now, I guess, you'll be answering the telephone from now on.'"

The victim testified that appellant then threw her to the floor, hit her several times, and kicked her. According to the victim, appellant "tossed [her] around like a . . . rag doll, throwing [her] into tables . . . [and] into the bar." Appellant also stood on the victim's chest and neck, attempting to choke her. During the attack, appellant said, "'What have I told you about not answering the telephone? You lied to me.'" She said appellant called her names while attacking her.

The victim arose, and appellant hit her a few more times. The victim told appellant that she felt like she was about to pass out and needed to sit. Appellant set the victim on a rocking chair. He dropped the food from Kentucky Fried Chicken in her lap and told her to eat. Appellant then paced in the hallway before returning to the victim, hitting her, and calling her names. Appellant stopped hitting the victim and began pacing again. After pacing, appellant went back over to the victim and hit her a few more times. Appellant stopped hitting the victim, and she moved to sit on the couch. Appellant went to get ice for the victim. He gave her the ice and recommenced hitting her. The victim said that appellant brought her ice because her ear and face were swollen. The victim stated, "[T]his went on for about an hour, hour and a half, where he would just pace back and forth. He would come back, get right in front of me, and . . . I guess I took 50 to 60 blows during that time[.]"

The victim described most of the hits as open-fist hits. She said that at one point, appellant grabbed her head and used his fists to beat the top of her head. During the attack, appellant had gotten a steak knife, held it to the victim's throat, and said, "'I ought to just kill you now, b****.'" Appellant also held the knife to the victim's cheek before throwing the knife on the bar and pacing again. Appellant returned to the victim and held a towel with ice in it to her ear. The strikes to the victim's ear "just blew it open[] and blood went everywhere." Appellant took the victim's phone during the attack. He listened to her voicemail messages and looked through her call log and text messages.

After appellant's last hit, the victim went to the bathroom to see how she looked. She said that blood was "squirting" everywhere. The victim left appellant's house and said as she was leaving, "I'm going to bleed to death over this." Appellant was cleaning the blood off his couch when she left and asked her if she needed a blanket. The victim estimated that she was in appellant's house for approximately an hour and a half. During that time, she tried to leave and get help, but appellant would pull her back and not allow her to leave.

The victim drove herself to the emergency room after she left appellant's house, and the hospital staff admitted her. She was in the emergency room until approximately 8:00 a.m. the following morning and then moved to the Intensive Care Unit ("ICU") for seven days. The victim said that she lost hearing in one of her ears because of the injuries appellant inflicted upon her. She said that she had prior problems with fluid in her inner ear, but since the attack she had ringing and searing pain in her ear in addition to the fluid. The victim stated that appellant's attack caused her face to bruise and her eyes to swell shut. The victim had a "bad back," and appellant's "slinging" and "tossing" her around aggravated her back.

Doctors medicated the victim during her hospital stay. The victim said that "they were giving [her] enough medication that should have put an elephant down," but it did not "faze" her. She was very distraught, nervous, upset, and anxious. She could not sleep so the doctor gave her Ambien. The victim said that she suffered a great deal of pain because of the attack, and the pain continued after the hospital discharged her. When she left the hospital, her doctor sent her home with Lortab for her pain.

The victim recalled an officer from the Lawrenceburg Police Department coming to the hospital and photographing her injuries. The victim identified a photograph of the injuries to her face. She also identified a photograph of her right ear, which had "bursted." She said that the doctor drained her ear several times because it would collect fluid and swell. The victim identified a photograph of her chest. Using the photograph, she pointed out the mark that appellant's heel had made while he was stepping on her chest. Next, she identified a picture of her left ear. She said that her left ear was swollen. Doctors had to lance, drain, and insert a tube into her ear.

The victim testified that police officers periodically came to monitor her progress while she was in the hospital. On June 13th, police officers took additional photographs of the victim, which she identified at trial. The victim also identified a series of small photographs that she obtained from criminal investigators. The photographs depicted her injuries a week and a half after the hospital discharged her.

The victim testified that she did not go to appellant's house that night to confront him and did not expect a physical confrontation. She said they did not have a fight the week before while appellant was away. However, the victim said that if she did not answer the phone the first time appellant called, he would continue to call and "give [her] a fit" about not answering. She said that was the standard conduct between her and appellant, and she could not do anything that pleased him. The victim did not go to appellant's home intending to end their relationship.

On cross-examination, the victim testified that she did not have her phone records to show that appellant had continually called her. She said that the fight with appellant began when he questioned her about what time she would be at his house. The victim stated that the only thing that she said to appellant when she entered the house was that she had to wait for Kentucky Fried Chicken to prepare their dinner.

The victim testified that she did not try to get her phone during the attack because appellant had it. Appellant eventually set her phone down on the bar, and she was able to grab it before she left. She further testified that it would not have done her any good to run into another room and lock the door because appellant would have "busted it down." The victim did not hit appellant or try to grab the knife during the attack. When the victim left appellant's house, she did not go to a neighbor's house for help, call an ambulance, or call the police. She estimated that it took her five minutes to get to the hospital.

The victim did not lose consciousness because of appellant's attack. The victim said she felt that appellant was trying to control her life. She denied that appellant had ever expressed concerns about the amount of prescription drugs she was taking.

Dr. Kimberly Goodemote testified that on June 11, 2010, she treated the victim at Crockett Hospital. The victim gave Dr. Goodemote and the attending nurses and doctors a medical history. Dr. Goodemote identified the victim's medical history record from June 12, 2010, the day the victim was admitted into the hospital. The medical history stated that the victim arrived at the hospital complaining of facial pain and trauma from appellant's hitting her. It also gave a brief summary of the attack. The medical history further stated that the victim was unsure whether the police had arrested appellant. The victim reported that appellant had never attacked her before and that "'he apparently ha[d] bi-polar disorder.'"

-4-

While in the emergency room, the victim had a hematoma drained around her ear, and treating physicians placed pressure dressing on it.

Dr. Goodemote also identified the victim's "Emergency Triage Form." The form listed the victim's arrival date and time as June 11, 2010 at 10:34 p.m. Dr. Goodemote stated that the victim's primary problem was trauma to her ear. According to Dr. Goodemote, Dr. Michael Boyd drained the victim's ear during the victim's hospital stay.

Dr. Goodemote identified the victim's "Discharge Summary" that stated the victim's final diagnoses as concussion, coma status, post-head trauma, left ear laceration, hyperglycemia, anemia, and hypokalemia. The treating physicians prescribed the victim Lortab for her pain. Dr. Goodemote testified that a patient who was already taking prescription pain medication before being hospitalized may require more pain medication than someone who did not normally take pain medication.

On cross-examination, Dr. Goodemote testified that she compiled the victim's medical history based on what the victim told her. She did not recall seeing appellant at the hospital. Dr. Goodemote identified a note that a nurse had written on one of the victim's records that said "'16:00; patient commented that boyfriend who had assaulted her had attempted to call her. She is requesting to be confidential and be notified of this. Patient made confidential and will be moved to ICU for closer observation and security.'" Dr. Goodemote stated that they "most likely" moved the victim to the ICU for security reasons.

Sergeant Stacey Faulkner, with the Lawrenceburg Police Department, testified that he responded to a call at Crockett Hospital on June 11, 2010. He went to the victim's room upon arriving at the hospital and observed the victim with her head wrapped in a gauze bandage with extra padding on the left side. The victim had blood on her face, chest, and hands. He asked the victim what caused her injuries, and she told him about appellant's phone calls and attack. Sergeant Faulkner said that the victim consistently told him the same story and never named a different attacker.

After speaking with the victim, Sergeant Faulkner left the hospital and signed a warrant for appellant's arrest. He went to appellant's home, but appellant was not there. Sergeant Faulkner was unable to find appellant that night.

On cross-examination, Sergeant Faulkner testified that he was the charging officer for this incident. He stated that he never entered appellant's home, executed a search warrant on appellant's home, or interviewed appellant. Sergeant Faulkner could not remember the information that he presented to the grand jury but said it was in his report. He testified that the information in his report was information that the victim gave him. Sergeant Faulkner

never found additional evidence suggesting that appellant was culpable for the victim's injuries.

After hearing the evidence, the jury convicted appellant of aggravated assault. The trial court sentenced appellant as a Range I, standard offender, to six years in the Tennessee Department of Correction. Appellant now appeals his conviction and sentence.

## II. Analysis

### A. Sufficiency of the Evidence

Appellant argues that the only evidence against him, the victim's testimony, was insufficient to prove his guilt beyond a reasonable doubt. In the alternative, he contends that "the victim participated in, or otherwise facilitated the crime, and therefore should be considered an accomplice." He posits that because the victim's testimony was uncorroborated, it was insufficient evidence to prove him guilty beyond a reasonable doubt.

It is well established that once a jury finds a defendant guilty, we remove and replace the presumption of innocence with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Thus, on appeal, a convicted defendant bears the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). The jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. The trier of fact resolves all questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court does not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Moreover, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). We apply these rules to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The jury convicted appellant of aggravated assault. As relevant to his conviction, a person commits aggravated assault who intentionally or knowingly causes serious bodily injury to another. Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(i), 39-13-101(a)(1) (2010). Serious bodily injury is a bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E) (2010).

Viewed in the light most favorable to the State, the evidence was sufficient to sustain the conviction. The victim testified that appellant attacked her at his home on June 11, 2010. Appellant threw her to the ground, hit her, and kicked her. He also stood on her chest and neck attempting to choke her and held a knife to her throat while threatening to kill her. Appellant's attack caused the victim's ear to swell, burst open, and bleed. The victim was admitted to Crockett Hospital because of the injuries that appellant inflicted upon her. Physicians treated the victim for trauma to her ear. The photographs that Sergeant Faulkner took of the victim show bruises and trauma to the victim's body, especially her face. The victim testified that she suffered a great deal of pain because of the attack, and the pain continued after the hospital discharged her. Moreover, victim had fluid accumulation, ringing, and searing pain in her ear as a result of the attack. Appellant asserts that the victim's testimony was insufficient to establish his guilt beyond a reasonable doubt; however, it is the sole province of the jury to determine witness credibility. *See State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) ("The jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof." (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008))). By its guilty verdict, the jury obviously accredited the victim's testimony at trial. This issue is without merit.

Appellant alternatively argues that the victim was his accomplice. He claims that the victim's testimony "indicated that she participated in a heightening level of hostility between her and [appellant]" and that the victim verbally provoked appellant. Appellant asserts that because the victim willingly went to appellant's home and did not try to avoid the encounter or protect herself, she was an accomplice whose testimony required corroboration. The State responds that no evidence existed that showed the victim was in any way an accomplice to the crime.

"An accomplice is defined as a person who knowingly, voluntarily[,] and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When there are clear and undisputed facts regarding a witness's participation in the crime, the question of whether he or she is an accomplice is one of law that the court must decide. *Perkinson*, 867 S.W.2d at 7. If facts are disputable or susceptible to varying inferences, the question of whether the witness is an accomplice then becomes a

question of fact for the jury. *Id.* (citing *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975)). "The determination of whether a witness is an accomplice focuses upon 'whether the witness could be indicted for the same offense as the defendant.'" *State v. Harris*, W2010-02512-CCA-R3CD, 2012 WL 29203, at *7 (Tenn. Crim. App. Jan. 5, 2012) (quoting *State v. Tyree Robinson*, No. W2008-01001-CCA-R3-CD, 2009 WL 1741401, at *7 (Tenn. Crim. App. June 16, 2009)).

In our view, the evidence did not establish that the victim "knowingly, voluntarily, and with common intent" participated with the defendant in the aggravated assault of herself. *Anderson*, 985 S.W.2d at 16. The evidence showed that the victim and appellant routinely argued about appellant's phone calls. The presentence report shows that appellant has previously been convicted for aggravated assault against the victim; however, the victim advised her treating physicians that appellant "had never done this to her before." Appellant was smiling when the victim arrived at his house, and the victim did not know that he was about to assault her. The victim did not go to appellant's home to engage in a confrontation. The victim testified that appellant alone caused her injuries, and no evidence indicated that the victim participated with appellant in causing substantial bodily injury to herself. Even assuming, *arguendo*, that the victim participated, a grand jury could not have indicted her for the same offense as appellant because the aggravated assault statute requires that a defendant cause "serious bodily injury to *another.*" Tenn. Code Ann. § 39-13-102(a)(1)(A)(i) (2010) (emphasis added). Accordingly, we agree with the State that the victim was not an accomplice. Consequently, it was not necessary that the State corroborate the victim's testimony concerning the offense. Appellant is not entitled to relief on this issue.

### B. Prosecutor's Closing Argument

Next, appellant argues that the State's reference to the "some other dude did it" defense during its closing argument inappropriately shifted the burden of proof to appellant and amounted to prosecutorial misconduct. The State replies that the defendant waived this issue by failing to contemporaneously object. The State further contends that, despite any waiver, the defendant's issue is without merit.

"[A]rgument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Tennessee courts give great latitude to counsel arguing their cases to the jury. *Id.* Thus, "trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion." *Id.*

To succeed on a claim of prosecutorial misconduct, the appellant must show that "the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). When determining whether the argument affected the jury's verdict, we consider the

following five factors: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)

Appellant's failure to contemporaneously object to the prosecutor's allegedly improper remark waives appellate review of this issue. *State v. Hunt*, No. W2007-01767-CCA-R3-CD, 2008 WL 2901597, at *3 (Tenn. Crim. App. July 21, 2008) (citing Tenn. R. App. P. 36(a); *State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999)). Waiver notwithstanding, the appellant's contention is without merit. The prosecutor did not state anything that was improper. In fact, the prosecutor's rebuttal argument restated the theory set forth in appellant's opening and closing arguments: appellant did not assault the victim and someone else did. This statement did not shift the burden of proof to appellant. Moreover, the trial court instructed the jury regarding the State's burden of proof. We see nothing improper about the prosecutor's statement. This issue is without merit.

## C. Sentencing

Finally, appellant challenges the sentence imposed by the trial court. Specifically, appellant contends that the trial court should have granted him an alternative sentence and that the trial court erred in applying as an enhancement factor that he "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(5) (2010). The State responds that the record supports appellant's sentence.

When an accused challenges the length and manner of service of a sentence, this court conducts a de novo review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2010). We condition this presumption upon "the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). We do not apply the presumption to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court predicated upon uncontroverted facts. *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); *State v. Bonestel*, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In conducting a de novo review of a sentence, we must consider (a) any evidence received at the trial, sentencing hearing, or both; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel about sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statistical

information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; (h) any statements made by the accused in his own behalf; and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *Ashby*, 823 S.W.2d at 169.

When imposing a sentence within the appropriate range of punishment for a defendant:

[T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210 (2010). From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Id*. at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007) *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

A court no longer presumes that a defendant is a favorable candidate for alternative sentencing under the revised Tennessee sentencing statutes. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (2010).

A trial court may deny alternative sentencing and sentence a defendant to confinement based on any of the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

-10-

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

*Id*. § 40-35-103(1). Furthermore, the trial court should examine the defendant's potential for rehabilitation, or lack thereof, when determining whether an alternative sentence is appropriate. *Id*. § 40-35-103(5).

Appellant asserts that the record does not support the trial court's finding that appellant would not likely abide by the terms of his probation and would commit another crime. The trial court sentenced appellant as a Range I, standard offender, to six years in the Tennessee Department of Correction. The trial court noted that appellant was on probation when he committed this crime. The trial court observed that appellant had eight misdemeanor convictions that "arose from either an act of violence toward a female victim or charges stemming from an act of violence concerning a victim." The trial court considered appellant's social, physical, and mental histories. The trial court found that there was a good chance that appellant would not abide by the terms of his probation and that confinement was necessary to protect the society from any further criminal conduct of appellant. The trial court gave great consideration to the fact that measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the appellant. The trial court further found that confinement would provide deterrence to those likely to commit aggravated assault. The record reflects that the trial court properly considered the appellant's request for alternative sentencing. Thus, we conclude that the trial court properly denied an alternative sentence in this case.

Pursuant to the 2005 amendments, our Sentencing Act has abandoned the statutory minimum sentence and renders enhancement and mitigating factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c) (2010). The 2005 amendments set forth certain "advisory sentencing guidelines" that do not bind the trial court; however, the trial court is required to consider them. *See id*. § 40-35-210(c). Although the application of factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court is also required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(d).

The trial court found the following enhancement factors applicable to appellant:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

. . . .

(5) The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense;

. . . .

(11) The felony resulted in death or serious bodily injury, or involved the threat of death or serious bodily injury, to another person, and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury;

. . . .

(13) At the time the felony was committed, . . . the following classification[] was applicable to the defendant:
. . . .
(C) Released on probation[.]

*Id*. § 40-35-114.

Appellant asserts that the trial court erred when it applied enhancement factor (5) because it is an essential element of aggravated assault. "[P]roper application of enhancement factor (5) requires a finding of cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995) *overruled on other grounds by State v. Winfield*, 23 S.W.3d 279 (Tenn. 2000); *State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997)). "[B]ecause 'exceptional cruelty' is inherent in some offenses such as aggravated assault, the facts must demonstrate a culpability distinct from and greater than that incident to the offense." *State v. Kelly Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App. Mar. 14, 2000) (citing *Poole*, 945 S.W.2d at 98.) The "exceptional cruelty" enhancement factor refers to "the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *Id.* "Thus, cruelty requires more than the physical infliction of serious bodily injury upon a victim." *Id.*

Here, appellant beat the victim for at least an hour. He went through a cycle of stopping the attack momentarily only to recommence it. He hit the victim more than fifty times, held a knife to her throat, threatened to kill her, and stepped on her neck and chest

attempting to choke her. Appellant's attack on the victim was more than just the physical infliction of serious bodily injury upon the victim. *See id.* Thus, we conclude that application of enhancement factor (5) was appropriate.

Moreover, even if we were to conclude that application of enhancement factor (5) was inappropriate, the record shows that the other enhancement factors applied by the trial court were sufficient to support appellant's sentence. Appellant had a previous history of criminal convictions including felony convictions for aggravated assault and aggravated burglary and misdemeanor convictions for domestic assault, simple assault, and vandalism. *See* Tenn. Code Ann. § 40-35-114(1) (2010). Appellant's aggravated assault on the victim resulted in serious bodily injury to the victim, and appellant has previously been convicted of a felony that resulted in serious bodily injury.[1] *See id.* § 40-35-114(11). Appellant was serving a six-year sentence suspended to probation when the jury convicted him in this case. *See id.* § 40-35-114(13). Accordingly, we conclude that appellant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE

---

[1] Although this enhancement factor includes language that is in the aggravated assault statute, its application has the additional requirement that appellant have a prior felony involving death or serious bodily injury. Thus, this factor does not constitute an element of aggravated assault.